Marianne STANLEY, Plaintiff–Appellant,

v.

UNIVERSITY OF SOUTHERN CALIFORNIA; Michael L. Garrett, Individually and His Official Capacity as Athletic Director; Does 1 Through 20, Inclusive, Defendants–Appellees.

No. 93–56185.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Nov. 2, 1993.

Decided Jan. 6, 1994.

Robert L. Bell, Law Offices of Robert L. Bell, Washington, DC, Alvin L. Pittman, Law Offices of Alvin L. Pittman, Los Angeles, CA, for plaintiff-appellant.

J. Al Latham, Jr., Paul, Hastings, Janofsky & Walker, Los Angeles, CA, for defendants-appellees.

Before: ALARCON, LEAVY and KLEINFELD, Circuit Judges.

**1316**

ALARCON, Circuit Judge:

Marianne Stanley, former head coach of the women's basketball team at the University of Southern California (USC), appeals from an order denying her motion for a preliminary injunction against USC and Michael Garrett, the athletic director for USC (collectively USC).

Coach Stanley contends that the district court abused its discretion in denying a preliminary injunction on the ground that she failed to present sufficient evidence of sex discrimination or retaliation to carry her burden of establishing a clear likelihood of success on the merits. Coach Stanley also claims that the court misapprehended the nature of the preliminary injunction relief she sought. In addition, she argues that the district court clearly erred in finding that USC would suffer significant hardship if the preliminary injunction issued. Coach Stanley further asserts that she was denied a full and fair opportunity to present testimonial evidence at the preliminary injunction hearing and to demonstrate that USC's purported justification for paying a higher salary to George Raveling, head coach of the men's basketball team at USC, was a pretext for sex discrimination and retaliation. We affirm because we conclude that the district court did not abuse its discretion in denying the motion for a preliminary injunction. We also hold that the district court did not deny Coach Stanley a full and fair opportunity to present evidence of sex discrimination, retaliation, and pretext.

## I. PERTINENT FACTS

Coach Stanley signed a four-year contract with USC on July 30, 1989, to serve as the head coach of the women's basketball team. The expiration date of Coach Stanley's employment contract was June 30, 1993. Coach Stanley's employment contract provided for an annual base salary of $60,000 with a $6,000 housing allowance.

Sometime in April of 1993, Coach Stanley and Michael Garrett began negotiations on a new contract. The evidence is in dispute as to the statements made by the parties. Coach Stanley alleges in her declarations that she told Garrett that she "was entitled to be paid equally with the Head Men's Basketball Coach, George Raveling[,] and that [she] was seeking a contract equal to the one that USC had paid the Head Men's Basketball Coach" based on her outstanding record and the success of the women's basketball program at USC. She also requested a higher salary for the assistant coaches of the women's basketball team. According to Coach Stanley, Garrett verbally agreed that she should be paid what Coach Raveling was earning, but he asserted that USC did not have the money at that time. He indicated that "he would get back [to her] with an offer of a multi-year contract ... that would be satisfactory." Garrett alleges in his affidavit, filed in opposition to the issuance of the preliminary injunction, that Coach Stanley told him that "she wanted a contract that was identical to that between USC and Coach Raveling."

On April 27, 1993, Garrett sent a memorandum which set forth an offer of a three-year contract with the following terms:

1993–94 Raising your salary to $80,000 with a $6,000 housing allowance.

1994–95 Salary of $90,000 with a $6,000 housing allowance.

1995–96 Salary of $100,000 with a $6,000 housing allowance.

Presently, Barbara Thaxton's base salary is $37,000 which I intend to increase to $50,000. It is not my policy to pay associate or assistant coaches housing allowances. Therefore that consideration is not addressed in this offer.

The memorandum concluded with the following words: "I believe this offer is fair, and I need you to respond within the next couple of days so we can conclude this matter. Thank you." According to Garrett, Coach Stanley said the offer was "an insult."

Coach Stanley alleged that, after receiving this offer, she informed Garrett that she "wanted a multi-year contract but his salary figures were too low." Coach Stanley also alleged that she told Garrett she "was to make the same salary as was paid to the Head Men's Basketball Coach at USC." Garrett asserted that Coach Stanley demanded a "three-year contract which would pay

her a total compensation at the annual rate of $96,000 for the first 18 months and then increase her total compensation to the same level as Raveling for the last 18 months." He rejected her counter offer.

Coach Stanley alleged that Garrett stated to her that he thought his proposal was fair and he would "not spend a lot of time negotiating a contract." According to Coach Stanley, Garrett's attitude toward her changed and he became "hostile." Garrett told her that she would not be paid the same as Coach Raveling and that she should be satisfied with being the second highest paid women's basketball coach in the PAC–10 Conference.

After this discussion, Coach Stanley retained attorney Timothy Stoner to negotiate the terms of the new contract. Coach Stanley alleged that Garrett rejected her offer "to negotiate a contract that would allow me to gradually work my way to the contract salary and benefits level that USC had provided to George Raveling." Coach Stanley alleged further that Garrett refused to "negotiate in good faith." He withdrew the multi-year contact offer he had previously made to her. Coach Stanley also alleged that Garrett told her attorney that he would offer a one-year contract at a $90,000 salary, plus a $6,000 housing allowance.

Garrett alleges that Stoner proposed a three-year contract with compensation starting at $88,000 in the first year, $97,000 in the second year, and $112,000 in the third year. According to Garrett's affidavit, Coach Stanley also made certain "unprecedented demands, such as: free room and board for her daughter who is anticipated to attend USC as an undergraduate student; radio and television shows where Stanley and the women's team would be spotlighted; and monetary payments tied to conference championships, wins in NCAA play-off games, and coach of the year honors." Garrett indicated that these "incentives" were unacceptable to USC.

On June 21, 1993, Garrett transmitted a written offer of a one-year contract to Mr. Stoner. The offer contains the following terms with reference to salary:

In consideration of the performance of her duties and responsibilities as Head Women's Basketball Coach, USC shall pay to Stanley an annual salary of $96,000, commencing as of the effective date of this Agreement and payable in equal monthly installments. Stanley shall also be eligible to participate in all of the USC employee benefits as set forth from time to time in the USC Staff Handbook.

Coach Stanley alleges that she contacted Garrett sometime thereafter, "to remind him of the promise he and the University made to me for a multi-year contract that would fairly compensate me for my services and efforts...." Garrett told her that she had until the end of that business day to accept the one-year contract at $96,000 or USC would begin to look at other candidates for her position.

Garrett alleged that he received a telephone call from Coach Stanley on July 13, 1993, in which she "renewed her demand for the three-year contract on the economic terms previously proposed by her counsel." Garrett reiterated that a one-year contract at $96,000 was USC's final offer. Garrett told Coach Stanley that her final decision to reject or accept the offer had to be communicated to him by the end of the day.

Garrett alleged that Coach Stanley did not accept the offer. The following day, Coach Stanley sent a memorandum requesting additional time to consider the offer because she was too distressed to make a decision. Garrett sent a memorandum to Coach Stanley on July 15, 1993, in which he stated, *inter alia:*

My job as athletic director is to look out for the best interests of our women's basketball program as a whole, and that is what I have been trying to do all along. The best interests of the program are not served by indefinitely extending the discussions between you and the University, which have already dragged on for weeks. That is why I told you on Tuesday that I needed a final answer that day.

Since I did not hear from you, as it now stands the University has no offers on the table. If you want to make any proposals, I am willing to listen. Meanwhile, for the protection of the program, I must, and am,

actively looking at other candidates. I am sorry that you feel distressed by this situation. As I have said, I have to do what is best for our women's basketball program.

Finally, I was not aware that you were in Phoenix on official University business. Your contract with the University expired at the end of June, and I must ask you not to perform any services for the University unless and until we enter into a new contract. I will arrange for you to be compensated on a daily basis for the time you have expended thus far in July on University business....

Coach Stanley did not reply to Garrett's July 15, 1993 memorandum. Instead, on August 3, 1993, her present attorney, Robert L. Bell, sent a letter via facsimile to USC's Acting General Counsel in which he indicated that he had been retained to represent Coach Stanley. Bell stated he desired "to discuss an amicable resolution of the legal dispute between [his] client and the University of Southern California." Bell stated that if he did not receive a reply by August 4, 1993, he would "seek recourse in court." On August 4, 1993, USC's Acting General Counsel sent a letter to Bell via facsimile in which he stated that "[w]e are not adverse to considering carefully a proposal from you for an 'informal resolution.'"

## II. PROCEDURAL BACKGROUND

On August 5, 1993, Coach Stanley filed this action in the Superior Court for the County of Los Angeles. She also applied *ex parte* for a temporary restraining order (TRO) to require USC to install her as head coach of the women's basketball team.

The complaint sets forth various federal and state sex discrimination claims, including violations of the Equal Pay Act (EPA), 29 U.S.C. 206(d)(1) (1988), Title IX, 20 U.S.C. § 1681(a) (1988), the California Fair Employment and Housing Act (FEHA), Cal. Gov't Code § 12921 (West Supp.1993), and the California Constitution, Cal. Const. art. 1, § 8 (West 1983). The complaint also alleges common law causes of action including wrongful discharge in violation of California's public policy, breach of an implied-in-fact employment contract, intentional infliction of emotional distress, and conspiracy. As relief for this alleged conduct, Coach Stanley seeks a declaratory judgment that USC's conduct constituted sex discrimination, a permanent injunction restraining the defendants from discrimination and retaliation, an order "requiring immediate installation of [p]laintiff to the position of Head Coach of Women's Basketball at the USC," three million dollars in compensatory damages, and five million dollars in punitive damages.

On August 6, 1993, the Los Angeles Superior Court issued an oral order granting Coach Stanley's *ex parte* application for a TRO, pending a hearing on her motion for a preliminary injunction. The TRO ordered USC to pay Coach Stanley an annual salary of $96,000 for her services as head basketball coach of the women's team, and all benefits under the 1989 contract were to remain in effect. The record shows that, on June 30, 1993, the date that her four-year employment contract expired, Coach Stanley's salary was $62,000 per year with a $6,000 housing allowance.

On the same day that the TRO was issued, USC removed the action to the District Court for the Central District of California. On August 11, 1993, the district court ordered that the hearing on Coach Stanley's motion for a preliminary injunction be held on August 26, 1993, and that the TRO issued by the state court be extended and remain in effect until that date.

Coach Stanley and Garrett submitted their declarations prior to the August 26, 1993, hearing. At the hearing, Coach Stanley submitted the declaration of her physician, Dr. Elizabeth Monterio, regarding Coach Stanley's emotional state. Coach Stanley also made offers of proof as to the testimony of various witnesses. The court accepted the proffered testimony as true for purposes of ruling on the motion for preliminary injunction. These witnesses included one of the captains of the women's basketball team, two assistant coaches, and Timothy Stoner, Coach Stanley's former counsel.

Pursuant to Coach Stanley's request, the district court reviewed Coach Raveling's employment contract *in camera*. Later that

day, the district court denied the motion for a preliminary injunction.

## III. DISCUSSION

The gravamen of Coach Stanley's multiple claims against USC is her contention that she is entitled to pay equal to that provided to Coach Raveling for his services as head coach of the men's basketball team because the position of head coach of the women's team "require[s] equal skill, effort, and responsibility, and [is performed] under similar working conditions." Appellant's Opening Brief at 34. She asserts that USC discriminated against her because of her sex by rejecting her request. She also maintains that USC retaliated against her because of her request for equal pay for herself and her assistant coaches. According to Coach Stanley, USC retaliated by withdrawing the offer of a three-year contract and instead presenting her with a new offer of a one-year contract at less pay than that received by Coach Raveling.

We begin our analysis mindful of the fact that we are reviewing the denial of a *preliminary* injunction. There has been no trial in this matter. Because the hearing on the preliminary injunction occurred 21 days after the action was filed in state court, discovery had not been completed. Our prediction of the probability of success on the merits is based on the limited offer of proof that was possible under the circumstances. We obviously cannot now evaluate the persuasive impact of the evidence that the parties may bring forth at trial.

### A. *Standard of Review.*

■ We review the denial of a motion for preliminary injunction for abuse of discretion. *Chalk v. United States Dist. Court,* 840 F.2d 701, 704 (9th Cir.1988).

> An order is reversible for legal error if the court did not apply the correct preliminary injunction standard, or if the court misapprehended the law with respect to the underlying issues in litigation. An abuse of discretion may also occur if the district court rests its conclusions on clearly erroneous findings of fact.

*Id.* (citations omitted).

■ In *Martin v. International Olympic Committee,* 740 F.2d 670 (9th Cir.1984), we described the legal standard a district court must apply in exercising its discretion:

> In this circuit, a party seeking preliminary injunctive relief must meet one of two tests. Under the first, a court may issue a preliminary injunction if it finds that:
>
> > (1) the [moving party] will suffer irreparable injury if injunctive relief is not granted, (2) the [moving party] will probably prevail on the merits, (3) in balancing the equities, the [non-moving party] will not be harmed more than [the moving party] is helped by the injunction, and (4) granting the injunction is in the public interest.
>
> Alternatively, a court may issue a preliminary injunction if the moving party demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor. Under this last part of the alternative test, even if the balance of hardships tips decidedly in favor of the moving party, it must be shown as an irreducible minimum that there is a fair chance of success on the merits. There is one additional factor we must weigh. In cases such as the one before us in which a party seeks mandatory preliminary relief that goes well beyond maintaining the status quo *pendente lite,* courts should be extremely cautious about issuing a preliminary injunction.

*Id.* at 674–75 (internal quotations and citations omitted) (emphasis in original).

Coach Stanley argues that she did not seek a mandatory preliminary injunction. She asserts that she was "not seeking to be instated by USC, she was seeking to continue her employment with USC." Appellant's Opening Brief at 28. Coach Stanley maintains that she requested a prohibitory preliminary injunction and that the district court erred in applying the test for a mandatory preliminary injunction.

A prohibitory injunction preserves the status quo. *Johnson v. Kay*, 860 F.2d 529, 541 (2d Cir.1988). A mandatory injunction " 'goes well beyond simply maintaining the status quo *pendente lite* [and] is particularly disfavored.' " *Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979) (quoting *Martinez v. Mathews*, 544 F.2d 1233, 1243 (5th Cir.1976)). When a mandatory preliminary injunction is requested, the district court should deny such relief " 'unless the facts and law clearly favor the moving party.' " *Id.* Our first task is to determine whether Coach Stanley requested a prohibitory injunction or a mandatory injunction.

Coach Stanley's four-year contract terminated on June 30, 1993. She was informed by Garrett on July 15, 1993, that her employment contract had expired and that she should not perform any services for the university until both parties entered into a new contract. On August 6, 1993, the date this action was filed in state court, Coach Stanley was no longer a USC employee.

Accordingly, an injunction compelling USC to install Coach Stanley as the head coach of the women's basketball team and to pay her $28,000 a year more than she received when her employment contract expired would not have maintained the status quo. Instead, it would have forced USC to hire a person at a substantially higher rate of pay than she had received prior to the expiration of her employment contract on June 30, 1993. The district court did not err in concluding that Coach Stanley was seeking a mandatory injunction, and that her request was subject to a higher degree of scrutiny because such relief is particularly disfavored under the law of this circuit. *Anderson*, 612 F.2d at 1114.

B. *There Has Been No Clear Showing of a Probability of Success on the Merits of Coach Stanley's Claim for Injunctive Relief.*

In light of our determination that Coach Stanley requested a mandatory preliminary injunction, we must consider whether the law and the facts clearly favor granting such relief. To obtain a preliminary injunction, Coach Stanley was required to demonstrate that her remedy at law was inadequate. *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 & n. 8, 79 S.Ct. 948, 954–55 & n. 8, 3 L.Ed.2d 988 (1959) ("The basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") (footnote omitted).

In her motion for a preliminary injunction filed in the state court, Coach Stanley requested an order "enjoining the defendants from forcing plaintiff to enter into an unfair and sex discriminatory contract and interfering with plaintiff (sic) continued performance as head coach of women's basketball until such time as the Court may enter a final determination on the merits of this action." As described above, the state court granted a temporary restraining order installing Coach Stanley to the position of head coach of the women's basketball team, at a higher annual salary, 37 days after her four-year contract had expired. On August 6, 1993, this matter was removed to the district court, before the state court could rule on the motion for a preliminary injunction.

The district court ordered USC and Garrett to file their opposition to Coach Stanley's motion for a preliminary injunction on August 18, 1993. On August 24, 1993, Coach Stanley filed her reply. In her reply, Coach Stanley states:

> Thus, *Plaintiff*, in her motion for TRO, and in this hearing for a preliminary injunction, *is simply seeking to maintain the status quo between the parties at the firm and final salary offered by Defendants* and to restrain Defendants from wrongfully locking out Plaintiff from the performance of her duties as Head Women's Basketball Coach simply because she is engaged in protected activities, i.e., seeking equal pay and benefits as are provided to the Head Men's Basketball Coach at U.S.C.

(emphasis added).

Plaintiff's Reply to Defendants' Opposition to Plaintiff's Motion For Preliminary Injunction at 11 (emphasis added).

To the extent that Coach Stanley is seeking money damages and back pay for the loss of her job, her remedy at law is ade-

quate. *Cf. Anderson v. United States,* 612 F.2d at 1115 (mandatory injunction is inappropriate where retroactive promotion and back pay are available if the employee succeeds on the merits). The district court, however, construed the motion for a preliminary injunction as including a request that future discrimination or retaliation based on the fact that she is a woman be enjoined. We do so as well for purposes of resolving the present appeal.

### 1. *Merits of Coach Stanley's Claim of Denial of Equal Pay for Equal Work.*

■■■ The district court concluded that Coach Stanley had failed to demonstrate that there is a likelihood that she would prevail on the merits of her claim of a denial of equal pay for equal work because she failed to present facts clearly showing that USC was guilty of sex discrimination in its negotiations for a new employment contract. The thrust of Coach Stanley's argument in this appeal is that she is entitled, as a matter of law, "to make the same salary as was paid to the Head Men's Basketball Coach at USC." Appellant's Opening Brief at 9. None of the authorities she has cited supports this theory.

In her reply brief, Coach Stanley asserts that she has "never said or argued in any of her submissions that the compensation of the men's and women's basketball coaches at USC or elsewhere must be identical." Appellant's Reply Brief at 2. Coach Stanley accuses USC of mischaracterizing her position. This argument ignores her insistence to Garrett that she was entitled to the "same salary" received by Coach Raveling. The denotation of the word "same" is "identical." Webster's Third New International Dictionary 2007.

In her reply brief, Coach Stanley asserts that she merely seeks equal pay for equal work. In *Hein v. Oregon College of Education,* 718 F.2d 910 (9th Cir.1983), we stated that to recover under the Equal Pay Act of 1963, 29 U.S.C. § 206(d)(1) (1988), "a plaintiff must prove that an employer is paying different wages to employees of the opposite sex for equal work." *Hein,* 718 F.2d at 913. We concluded that the jobs need not be identical,

but they must be "substantially equal." *Id.* (internal quotation and citation omitted).

■■■ The EPA prohibits discrimination in wages "between employees on the basis of sex ... for equal work, on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1) (1988). Each of these components must be substantially equal to state a claim. *Forsberg v. Pacific Northwest Bell Tel.,* 840 F.2d 1409, 1414 (9th Cir.1988).

Coach Stanley has not offered proof to contradict the evidence proffered by USC that demonstrates the differences in the responsibilities of the persons who serve as head coaches of the women's and men's basketball teams. Coach Raveling's responsibilities as head coach of the men's basketball team require substantial public relations and promotional activities to generate revenue for USC. These efforts resulted in revenue that is 90 times greater than the revenue generated by the women's basketball team. Coach Raveling was required to conduct twelve outside speaking engagements per year, to be accessible to the media for interviews, and to participate in certain activities designed to produce donations and endorsements for the USC Athletic Department in general. Coach Stanley's position as head coach did not require her to engage in the same intense level of promotional and revenue-raising activities. This quantitative dissimilarity in responsibilities justifies a different level of pay for the head coach of the women's basketball team. *See Horner v. Mary Inst.,* 613 F.2d 706, 713–14 (8th Cir. 1980) (evidence that male physical education teacher had a different job from a female physical education teacher because he was responsible for curriculum precluded finding that jobs were substantially similar; court may consider whether job requires more experience, training, and ability to determine whether jobs require substantially equal skill under EPA).

■■■ The evidence presented by USC also showed that Coach Raveling had substantially different qualifications and experience related to his public relations and revenue-

generation skills than Coach Stanley. Coach Raveling received educational training in marketing, and worked in that field for nine years. Coach Raveling has been employed by USC three years longer than Coach Stanley. He has been a college basketball coach for 31 years, while Coach Stanley has had 17 years experience as a basketball coach. Coach Raveling had served as a member of the NCAA Subcommittee on Recruiting. Coach Raveling also is the respected author of two bestselling novels. He has performed as an actor in a feature movie, and has appeared on national television to discuss recruiting of student athletes. Coach Stanley does not have the same degree of experience in these varied activities. Employers may reward professional experience and education without violating the EPA. *Soto v. Adams Elevator Equip. Co.,* 941 F.2d 543, 548 & n. 7 (7th Cir.1991).

Coach Raveling's national television appearances and motion picture presence, as well as his reputation as an author, make him a desirable public relations representative for USC. An employer may consider the marketplace value of the skills of a particular individual when determining his or her salary. *Horner,* 613 F.2d at 714. Unequal wages that reflect market conditions of supply and demand are not prohibited by the EPA. *EEOC v. Madison Community Unit*

*Sch. Dist. No. 12,* 818 F.2d 577, 580 (7th Cir.1987).

The record also demonstrates that the USC men's basketball team generated greater attendance, more media interest, larger donations, and produced substantially more revenue than the women's basketball team.[1] As a result, USC placed greater pressure on Coach Raveling to promote his team and to win. The responsibility to produce a large amount of revenue is evidence of a substantial difference in responsibility. *See Jacobs v. College of William and Mary,* 517 F.Supp. 791, 797 (E.D.Va.1980) (duty to produce revenue demonstrates that coaching jobs are not substantially equal), *aff'd without opinion,* 661 F.2d 922 (4th Cir.), *cert. denied,* 454 U.S. 1033, 102 S.Ct. 572, 70 L.Ed.2d 477 (1981).

■■■ Coach Stanley did not offer evidence to rebut USC's justification for paying Coach Raveling a higher salary. Instead, she alleged that the women's team generates revenue, and that she is under a great deal of pressure to win.[2] Coach Stanley argues that *Jacobs* is distinguishable because, in that matter, the head basketball coach of the women's team was not required to produce any revenue. *Jacobs,* 517 F.Supp. at 798. Coach Stanley appears to suggest that a difference in the amount of revenue generated by the men's and women's teams should

---

1. The total average attendance per women's team game during Coach Stanley's tenure was 751 as compared to 4,035 for the men's team during the same period. The average sales of season ticket passes to faculty and staff for women's games were 13, while the average sales for men's games were 130. Alumni and other fans, on average, purchased 71 passes for women's home games as compared to over 1,200 season passes for men's home games during the same period. A season pass to the men's home games was more than double the price of a season pass to women's home games.

The same disparity exists with respect to media interest in the men's and women's basketball teams. Television and radio stations paid USC to broadcast the men's basketball games; all of the home games and many games off campus were broadcast on network or cable stations. All of the games were broadcast on commercial radio. Approximately three of the women's basketball games were broadcast on cable stations as part of a contract package that also covered several other sports.

Donations and endowments were likewise greater for the men's basketball team, totalling $66,916 during the time period of Coach Stanley's contract, as compared to $4,288 for the women's basketball team. The same was true for revenue production. While the women's basketball team produced a total revenue of $50,262 during Coach Stanley's four years, the men's team generated $4,725,784 during the same time period.

2. Coach Stanley also alleged that, as head coach, she had won four national women's basketball championships, but that Coach Raveling had won none. In addition, while head coach at USC, Coach Stanley was named PAC–10 Coach-of-the-Year in 1993 and the women's basketball team played in the last three NCAA Tournaments and advanced to the NCAA Sweet Sixteen in 1993 and the NCAA Elite in 1992. She also described numerous speaking engagements in which she had participated.

be ignored by the court in comparing the respective coaching positions. We disagree.

We agree with the district court in *Jacobs* that revenue generation is an important factor that may be considered in justifying greater pay. We are also of the view that the relative amount of revenue generated should be considered in determining whether responsibilities and working conditions are substantially equal. The fact that the men's basketball team at USC generates 90 times the revenue than that produced by the women's team adequately demonstrates that Coach Raveling was under greater pressure to win and to promote his team than Coach Stanley was subject to as head coach of the women's team.

Coach Stanley's reliance on *Burkey v. Marshall County Board of Education*, 513 F.Supp. 1084 (N.D.W.Va.1981), and *EEOC v. Madison Community Unit School District No. 12*, 818 F.2d 577 (7th Cir.1987) to support her claim of sex discrimination is misplaced. In *Burkey*, the women coaches were "uniformly paid one-half (½) of the salary which male coaches of *comparable or identical boys' junior high school sports were paid.*" *Burkey*, 513 F.Supp. at 1088 (emphasis added). Here, however, Coach Stanley has not shown that her responsibilities were identical.

In *Madison*, the Seventh Circuit held that the plaintiff established a prima facie EPA claim because "male and female coaches alike testified that the skill, effort, and responsibility required were the same and the working conditions [were] also the same—*not merely similar*, which is all the Act requires." *Madison*, 818 F.2d at 583 (emphasis added). In the instant matter, the uncontradicted evidence shows that Coach Raveling's responsibilities, as head coach of the men's basketball team, differed substantially from the duties imposed upon Coach Stanley.

■ Coach Stanley contends that the failure to allocate funds in the promotion of women's basketball team demonstrated gender discrimination. She appears to argue that USC's failure to pay her a salary equal to that of Coach Raveling was the result of USC's "failure to market and promote the women's basketball team." The only evidence Coach Stanley presented in support of this argument is that USC failed to provide the women's team with a poster containing the schedule of games, but had done so for the men's team. This single bit of evidence does not demonstrate that Coach Stanley was denied equal pay for equal work. Instead, it demonstrates, at best, a business decision to allocate USC resources to the team that generates the most revenue.[3]

■ The district court also was "unconvinced" by Coach Stanley's claim that USC's disparate promotion of men's and women's basketball teams had "caused the enormous differences in spectator interest and revenue production." The court rejected Coach Stanley's assertion that the differences were due to societal discrimination and that this was evidence of a prima facie case under the EPA. The court reasoned that societal discrimination in preferring to witness men's sports in greater numbers cannot be attributed to USC. We agree. *Cf. Madison*, 818 F.2d at 580–82 (EPA does not prohibit wages that reflect market conditions of supply and demand, which may depress wages in jobs held mainly by women).

At this preliminary stage of these proceedings, the record does not support a finding that gender was the reason that USC paid a higher salary to Coach Raveling as head coach of the men's basketball team than it offered Coach Stanley as head coach of the women's basketball team. Garrett's affidavit supports the district court's conclusion that the head coach position of the men's team was not substantially equal to the head coach position of the women's team. The record shows that there were significant differences between Coach Stanley's and Coach Raveling's public relations skills, credentials, experience, and qualifications; there also were substantial differences between their responsibilities and working conditions. The district court's finding that the head coach positions were not substantially equal is not a "clear error of judgment." *Martin v. Inter-*

3. Coach Stanley has not contended either in the district court or before this court that this evidence would support an inference that USC violated Title IX, 20 U.S.C. § 1681(a) (1988).

*national Olympic Comm.*, 740 F.2d 670, 679 (9th Cir.1984).

### 2. *Merits of Coach Stanley's Claim of Retaliation.*

 The district court also rejected Coach Stanley's claim that USC terminated her contract or failed to renew her contract in retaliation for her involvement in protected activities. Rather, the court found that her contract had expired and she refused to accept any of the renewal options that USC offered. This finding is not clearly erroneous. Although Coach Stanley contends that she accepted the multi-year contract and continued only to negotiate the terms of the compensation, the district court found this assertion to be "contrary to the weight of the evidence which clearly suggests that Ms. Stanley failed to accept USC's three-year contract because she was dissatisfied with the proposed compensation." The record supports this finding. Coach Stanley rejected the three-year contract offered by USC. She made a counter offer which USC did not accept. The disagreement on the amount of pay precipitated an impasse in the negotiations.

Coach Stanley's argument that Garrett retaliated against her because she demanded equal pay does not square with the evidence she has produced. After she demanded the same pay that Coach Raveling receives, she was offered a multi-year contract at a substantially higher salary than she had received under her original employment agreement. This offer remained open until June 7, 1993. The offer was rejected by Coach Stanley.

Contrary to Coach Stanley's contention, the offer of a one-year contract at an increase of $28,000 in total compensation does not clearly demonstrate retaliation. Rather, it tends to show that USC wanted to retain her services, at a substantial increase in salary. The fact that she was offered a one-year contract after her four-year contract expired does not demonstrate discrimination or retaliation. The record shows Coach Raveling was offered a one-year renewal contract after his initial five year contract expired.[4]

We express no opinion as to whether Coach Stanley ultimately will establish a prima facie case of sex discrimination or retaliation at trial. We hold only that Coach Stanley has failed to demonstrate that the law and the facts clearly favor her position. *See Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir.1979).

### C. *There Has Been No Showing of a Nexus Between Hardship and the Conduct of USC.*

 The district court found that Coach Stanley presented sufficient facts from which it could be inferred that she suffered emotional distress, loss of business opportunity, and injury to her reputation following the expiration of her four-year employment contract and the failure of negotiations for a new contract. The court was "persuaded that Coach Stanley [had] sustained her burden to demonstrate a threat of imminent irreparable harm if preliminary injunctive relief [was] denied."[5] Neither party challenges this finding.

---

4. *Miller v. Fairchild Industries, Inc.*, 797 F.2d 727 (9th Cir.1986) is therefore distinguishable. Coach Stanley did not produce evidence that a causal connection existed between her demand for equal pay and the failure to renew her contract as did the plaintiffs in *Miller*. There, we reversed a summary judgment in favor of the employer who advanced economic layoff as a justification for the discharge of two African American females who had previously filed EEOC discrimination claims against the employer and settled. The layoffs occurred less than two months after they negotiated the EEOC settlement agreement and the management personnel who participated in the EEOC settlement negotiations were also responsible for their layoffs. Plaintiff's declarations established that they

were the only employees laid off; the employer disputed this fact. We held that summary judgment under these circumstances was not appropriate. *Miller*, 797 F.2d at 732–33.

5. The allegations of intentional sex discrimination, prospective loss of reputation, business opportunity, and serious emotional distress, the court reasoned, could not be remedied by money damages. There is legal support for the court's conclusion. *See, e.g., Chalk v. United States Dist. Court*, 840 F.2d 701, 709 (9th Cir.1988) (emotional distress, depression, and anxiety may constitute irreparable injury); *Garcia v. Lawn*, 805 F.2d 1400, 1405 (9th Cir.1986) (chilling effect of retaliation may be irreparable harm).

The district court also concluded, however, that Coach Stanley failed to demonstrate that the facts clearly show that USC discriminated or retaliated against her on the basis of her gender. As discussed above, Coach Stanley failed to demonstrate that the facts developed in the record and the law clearly favored the issuance of a mandatory preliminary injunction. She has failed to show that the injury she suffered was caused by the alleged wrongful conduct of USC.

D. *The District Court's Finding that the Balance of Hardships Do Not Tip Sharply in Coach Stanley's Favor is Not Clearly Erroneous.*

■ Coach Stanley challenges the district court's finding that the balance of hardships did not tip sharply in her favor. She argues that USC presented no evidence to demonstrate any hardship.

Although the district court found that the balance of hardships was "tipped to some degree in [Coach] Stanley's favor[,]" it found that USC would suffer some prejudice if the injunction was granted. Garrett's affidavit and supporting exhibits demonstrate that a preliminary injunction would cause USC hardship. This evidence establishes that Garrett wanted to conclude contract negotiations before the June 30, 1993 expiration of Coach Stanley's contract because

[t]he summer months are critical for recruiting of student athletes. In addition, it is essential that the head coach be in place by the time the students arrive for the Fall term, which at USC generally is the Monday before Labor Day. This is because the coach is responsible for providing general supervision of and counselling to the student athletes in their academic and personal lives. In addition, practices commence soon after the Fall term begins in preparation for pre-season games.

The district court drew a logical inference of hardship from this evidence. The district court reasoned that issuing the injunction would force USC into a unilateral contract which would provide Coach Stanley with a significant pay increase, but would not require any commitment by Coach Stanley to remain at USC as the head coach of women's basketball. If Coach Stanley were reinstated to the position pursuant to a preliminary injunction, her compensation would be $96,-000, a sum she rejected when it was offered to her previously. Accordingly, USC would have a head coach who was dissatisfied with the terms of her employment. Her state of mind, and the impermanence of her position, would likely affect the ability of the school to recruit athletes concerned about the quality and identity of the coaching staff for the next four years. The court concluded that if USC was not permitted to seek out "a replacement of Coach Stanley prior to commencement of the Fall semester, USC will suffer a serious hardship."

The record supports the district court's finding that USC would suffer some hardship if the preliminary injunction issued. In light of the evidence of the impact on the women's basketball program if USC were forced to hire an employee, *pendente lite,* who claims the school discriminates on the basis of sex, we conclude that the district court did not clearly err in finding that the balance of hardships did not tip sharply in Coach Stanley's favor.

E. *The District Court's Finding that the Public's Interest Was Not Served by Granting the Preliminary Injunction Is Not Clearly Erroneous.*

■ Coach Stanley argues that the strong public interest in preventing intentional sex discrimination and discriminatory employment practices weighs in favor of granting the preliminary injunction. We agree with the district court that "[t]his argument would be quite persuasive had [Coach] Stanley come forward with some evidence that her termination was the result of sex discrimination and that she was reasonably likely to prevail on the merits of her discrimination claim."

Coach Stanley failed to present evidence that she would probably prevail on her claims of sex discrimination and retaliation. The evidence also does not establish that the balance of hardships tipped sharply in her favor. Consequently, the district court did not err in concluding that the public's interest in preventing sex discrimination and dis-

criminatory employment practices did not clearly favor granting a mandatory preliminary injunction.

### F. Procedural Challenges to the Preliminary Injunction Hearing.

▆▆▆▆ Coach Stanley claims that the district court violated her right to due process by requiring her to make offers of proof rather than permitting her witnesses to testify. This contention is without merit. In this circuit, the refusal to hear oral testimony at a preliminary injunction hearing is not an abuse of discretion if the parties have a full opportunity to submit written testimony and to argue the matter. *Kenneally v. Lungren,* 967 F.2d 329, 335 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 979, 122 L.Ed.2d 133 (1993); *International Molders' & Allied Workers' Local Union v. Nelson,* 799 F.2d 547, 555 (9th Cir.1986); *San Francisco–Oakland Newspaper Guild v. Kennedy,* 412 F.2d 541, 546 & n. 6 (9th Cir.1969).

Coach Stanley had an opportunity to present additional affidavits. In addition, the district court accepted her offers of proof as conclusive proof of the matter represented.

▆▆▆ Coach Stanley also asserts that the district court erred in resolving the preliminary injunction without providing her an opportunity to conduct discovery. We disagree. Coach Stanley requested a preliminary injunction on August 5, 1993. She did not file a request for a continuance in order to complete discovery prior to the August 26, 1993 hearing on the motion for a preliminary injunction. Thus, the opportunity to conduct discovery was not denied; Coach Stanley simply did not avail herself of it prior to the hearing. Nothing precluded her from conducting discovery prior to the hearing on the preliminary injunction. She could have moved, *ex parte,* for an order shortening time within which to conduct depositions. *See* Fed.R.Civ.P. 30(a); *see also* W. Scwarzer, A.W. Tashima, J. Wagstaffe, Federal Civil Procedure Before Trial § 11:157 (1993) (Federal Rules of Civil Procedure require a court order if plaintiff desires to take a deposition during the first 30 days after service of the summons and complaint, and "good cause [for such an order] may exist because of the urgent need for discovery in connection with an application for TRO or preliminary injunction") (internal quotations omitted).

## IV. CONCLUSION

The district court did not abuse its discretion in denying a mandatory preliminary injunction. Coach Stanley did not meet her burden of demonstrating the irreducible minimum for obtaining a preliminary injunction: "that there is a fair chance of success on the merits." *Martin v. International Olympic Comm.,* 740 F.2d at 675. Because mandatory preliminary injunctions are disfavored in this circuit, we are compelled to review the record to determine whether the facts and the law clearly favor Coach Stanley. *Anderson,* 612 F.2d at 1114. The evidence offered at the hearing on the motion for a preliminary injunction demonstrated that Coach Stanley sought pay from USC equal to Coach Raveling's income from that university, notwithstanding significant differences in job pressure, the level of responsibility, and in marketing and revenue-producing qualifications and performance. A difference in pay that takes such factors into consideration does not prove gender bias or violate the Equal Pay Act. The unfortunate impasse that occurred during the negotiations for the renewal of the employment contract of an outstanding basketball coach followed the offer of a very substantial increase in salary— not sex discrimination or retaliation. Because Coach Stanley failed to demonstrate that the law and the facts clearly favor her position, the judgment is AFFIRMED.