**Tolagbe OGUNLEYE, Plaintiff,**

v.

**State of ARIZONA, et al., Defendants.**

**No. CV 99–275 TUC JMR.**

United States District Court,
D. Arizona.

July 8, 1999.

Donald T. Awerkamp, Law Firm of Raven & Kirschner PC, Tucson, AZ, for Plaintiff.

Lisa Kay Hudson, Deborah Ann Nastro, Arizona Attorney General's Office, Liability Management Section, Phoenix, AZ, Charles R. Pyle, Attorney General's Office, Tucson, AZ, for Defendants.

### ORDER

ROLL, District Judge.

Pending before the Court is Plaintiff Tolagbe Ogunleye's motion for a preliminary injunction. Plaintiff, formerly employed as a non-tenured professor in the Africana Studies Program of the University of Arizona, seeks reinstatement and lost income.

Prof. Ogunleye claims that she was discriminated against as a result of her support for an ousted faculty member and that she was treated differently than two male colleagues.

The University of Arizona asserts that Prof. Ogunleye was a disruptive force within her department and that because she was a non-tenured professor, she could be treated differently than two male tenured colleagues who engaged in similarly unprofessional conduct.

The Court has considered the pleadings, attachments thereto, and testimony and exhibits presented at the hearing on this motion. For the reasons set forth below, Petitioner's motion for preliminary injunction is denied.[1]

### PROCEDURAL BACKGROUND

Plaintiff began her employment as a faculty member of the Africana Studies Program (Program) at the University of Arizona in August 1996. At that time, Prof. Mikelle Omari was the Director of the Program. In October 1996, Prof. Omari was removed from her position and Prof. Julian Kunnie became acting director. Thereafter, the full-time professors in the Program were Profs. Julian Kunnie, Ikenna Dieke, Lansana Kieta, and Plaintiff. Only Plaintiff was non-tenured. All four professors are African–American. Plaintiff alleges that individual Defendants Prof. Kunnie and Charles Tatum, who was the Dean of the Humanities Department,[2] were responsible for the removal of Prof. Omari as Director of the Program.

---

1. This opinion constitutes the Court's findings of fact and conclusions of law. Findings of fact and conclusions of law regarding a preliminary injunction request are not final adjudications. The Court may reach different conclusions in later proceedings. *See University of Texas v. Camenisch,* 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981). *See also Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984).

2. Because the Africana Studies Program was a part of the Department of Humanities, Dean

On January 16, 1997, Prof. Omari filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). Plaintiff opposed removal of Prof. Omari and was a witness on her behalf during the EEOC investigation. Prof. Omari thereafter received a favorable determination of her EEOC claim.[3]

On May 27, 1998, Defendants notified Plaintiff that her contract would not be renewed beyond the 1998–1999 academic year. Plaintiff alleges that Defendants harassed her and subjected her to onerous terms and conditions of employment that were not placed upon similarly situated male co-workers.

On October 8, 1998, Plaintiff filed charges with the EEOC alleging sex discrimination and retaliation. On May 12, 1999, the EEOC issued its determination as to Plaintiff's claims of discrimination. The EEOC found that "the evidence indicates that [the University of Arizona] harassed and failed to treat [Plaintiff] the same as her male colleagues and has a pattern of terminating Black American females from their positions." (Defendants' Exhibit jj, at 1). Plaintiff's motion for preliminary injunction was filed on May 20, 1999.

## DISCUSSION

### 1. Standard for Injunctive Relief

■ A preliminary injunction should be granted if the movant demonstrates either a likelihood of success on the merits and the possibility of irreparable injury, or that serious questions are raised and the balance of hardships tips sharply in the movant's favor. *See United States v. Odessa Union Warehouse Co-op*, 833 F.2d 172 (9th Cir.1987). "These are not two distinct tests, but rather the opposite ends of a single continuum in which the required showing of harm varies inversely with the required showing of meritoriousness."

Tatum had supervisory responsibilities concerning the Program.

*Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir.1988) (citations omitted).

■ Because Plaintiff's contract has expired and she seeks an order that she be rehired, this matter involves a mandatory injunction. *See Stanley v. University of Southern California*, 13 F.3d 1313 (9th Cir.1994) (quotations and citations omitted). "When a mandatory injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party." *Id.* at 1319. Furthermore, the Ninth Circuit has stated that courts should be "extremely cautious" about issuing mandatory preliminary injunctions. *Martin v. International Olympic Committee*, 740 F.2d 670, 675 (9th Cir. 1984). The Court must deny relief "unless the facts and law clearly favor the moving party." *Id.*

### 2. Likelihood of Success on the Merits

■ In order to prevail on her Title VII claims, Plaintiff must first demonstrate a prima facie case of discrimination. *See Washington v. Garrett*, 10 F.3d 1421, 1432 (9th Cir.1993). Once Plaintiff establishes a prima facie case, the burden of proof then shifts to Defendants to articulate "a legitimate nondiscriminatory reason for the adverse employment decision." *Id.* Should Defendants provide such a reason, Plaintiff must establish that the alleged nondiscriminatory reason is a "pretext" for unlawful discrimination. *Id.* However, the "ultimate burden of persuading the trier of fact ... remains at all times with the plaintiff." *Id.*

### Prima Facie Case

■ Plaintiff may establish a prima facie case "by introducing evidence that gives rise to an inference of unlawful discrimination." *Id.* at 1433. Plaintiff argues that the EEOC determination is "by itself sufficient evidence of a likelihood of suc-

**3.** On November 25, 1998, the EEOC issued its determination that Prof. Omari was removed as Program director for discriminatory reasons.

**1108**

cess on the merits." (Plaintiff's Memorandum in Support of Preliminary Injunction, at 5). As previously discussed, the EEOC issued a determination in favor of Plaintiff. (Defendants' Exhibit jj, at 1).

■ EEOC findings constitute admissible, but not conclusive, proof of discrimination. *See Plummer v. Western Int'l Hotels Co., Inc.*, 656 F.2d 502, 504 (9th Cir. 1981). In addition to the EEOC finding, Plaintiff presented evidence that the college committee, the university committee, and Dean Tatum [4] recommended that her contract be renewed. Acting Program Director Kunnie and Provost Paul Sypherd favored nonrenewal. (Defendants' Exhibit 7). Accordingly, for purposes of this preliminary injunction, the Court assumes that the EEOC finding and other evidence presented during the hearing on this matter establish a prima facie case of discrimination. *See Sumner v. San Diego Urban League, Inc.*, 681 F.2d 1140, 1143 (9th Cir.1982) (evidence that the plaintiff was qualified for the job and the EEOC determination of reasonable cause established a prima facie case). However, in so ruling, the Court notes that apparently neither Provost Sypherd nor Dean Tatum were interviewed by EEOC investigators.[5]

### Nondiscriminatory Reason

■ Defendants argue, however, that they possessed a legitimate nondiscriminatory reason for their decision not to renew Plaintiff's contract. Specifically, Defendants argue that Plaintiff's contract was not renewed because she was a disruptive presence in the Program. Substantial evidence was presented to support this claim.

After it was announced that Prof. Kunnie was to become Acting Director of the Program, Plaintiff and Profs. Keita and Dieke, expressly rejected Prof. Kunnie as Acting Director, refused to cooperate with him, declined to participate in mediation,

and interfered with his management of the Program. Profs. Kieta and Dieke, unlike Plaintiff, were tenured professors.

In a December 15, 1997 letter to Dean Tatum, Plaintiff and Profs. Kieta and Dieke stated that "we just cannot bring ourselves to conduct any Program business with [Acting Director Kunnie]." (Plaintiff's Exhibit M). In a December 20, 1997 letter to the new Africana Studies Search Committee, Plaintiff and Profs. Kieta and Dieke stated that they "no longer recognize Julian Kunnie as 'acting director.'" (Defendants' Exhibit 8, Attachment 3). A January 7, 1998 letter from Profs. Dieke, Keita, and Plaintiff to University of Arizona President Peter Likins stated that "[t]he Program's faculty ... have come to the conclusion that it is no longer possible to regard the present Acting Director, Julian Kunnie, as having any administrative oversight of the Program." (Plaintiff's Exhibit Q).

■ Insubordination may constitute a legitimate, nondiscriminatory reason for a decision not to renew an employee's contract. *See Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1135 (8th Cir.1999); *Carter v. Miami*, 870 F.2d 578, 583–84 (11th Cir. 1989) (specific acts of insubordination demonstrated a legitimate, nondiscriminatory reason for employee's termination).

Evidence was produced that Plaintiff was unwilling to attempt reconciliation or cooperation with Acting Director Kunnie. In a December 16, 1997 letter to Provost Sypherd, Plaintiff and her two tenured colleagues wrote that they "in good ethical conscience, cannot now accept any cooperation with the person who is the Acting Director." (Plaintiff's Exhibit N). In response to a request by Prof. Kunnie to engage in mediation to resolve problems in the Program, Plaintiff and Profs. Dieke and Keita declined, stating in an April 18,

---

4. Dean Tatum testified that he did so in order to avoid charges of retaliation. However, he also testified that after Provost Sypherd decided to the contrary, he indicated to Provost Sypherd that he agreed with the Provost's decision.

5. The significance of an EEOC determination necessarily rests upon the thoroughness of the EEOC investigation.

1998 letter to Prof. Kunnie, that "it is absurd for you to proclaim that you 'act in the best interests' of the Program after you have willfully committed all kinds of racist, sexist, unscrupulous, and tom-foolery acts aimed at destroying faculty members." (Defendants' Exhibit 4).

Evidence was presented that when a search committee was formed to find suitable professors for the Program, the conduct of Plaintiff and others caused Profs. Adelea De la Torre and Charles Scruggs to resign from the search committee because of incivility directed towards them. (Defendants' Exhibit 8, Attachment 3, December 17, 1997 letter from Professor Charles Scruggs to Dean Tatum).[6] Acting Director Kunnie was forced to create a new committee without Plaintiff or her colleagues.[7]

In response to the new committee, on February 3, 1998, Plaintiff and Profs. Dieke and Kieta wrote in a letter to Prof. Kunnie that despite their removal from the search committee, they considered themselves to "remain active members" and would "attend every single meeting . . . . Duly informed or not, we will always find out where and when the meeting will be held . . . and we will always show up."

(Defendants' Exhibit 8, Attachment 3). In another letter, dated February 4, 1998, Plaintiff and Profs. Dieke and Kieta threatened to contact potential applicants and "apprise [them] of the corrupt nature of the search process." (Defendants' Exhibit 8, Attachment 4). This action may reasonably be interpreted as a declaration of intent to interfere with the operation of the search committee.

In a February 4, 1998 letter to University of Arizona President Peter Likins, Plaintiff and Profs. Dieke and Kieta referred to Acting Director Kunnie as "this chameleonesque moral reprobate." (Defendants' Exhibit 8, Attachment 3). In a May 14, 1998 letter to Acting Director Kunnie, Plaintiff stated, "I don't expect your devilment and viciousness to cease. Nor do I believe that you will ever behave like a child of God." (Plaintiff's Exhibit aa).

After these events had occurred, on May 27, 1998, Plaintiff was notified that her contract would not be renewed.[8]

█ The use of insults, a harsh tone, and sarcasm also constitute legitimate, non-discriminatory reasons for the nonrenewal of an employee's contract. *See Kiel,* 169 F.3d at 1135; *Kahn v. United States Secretary of Labor,* 64 F.3d 271, 279–80

---

**6.** Prof. Adela de la Torre eventually resigned from the committee. In a December 18, 1997 letter to Prof. Adela de la Torre, chairperson of the search committee, the "Africana Studies Faculty" chastised her for "continu[ing] to be committed to someone who holds the purely temporary position of 'Acting Director' in a Program where this person has lost all credibility with the faculty." (Defendants' Exhibit 8, Attachment 3).

**7.** In his resignation letter, Professor Scruggs stated, "I was somewhat shocked by the lack of civility that existed during the meeting, incivility directed not only toward me but toward Kunnie . . . who is the very model of civility."

**8.** Thereafter, in response to a finding by the Affirmative Action Office of the University of Arizona that Acting Director Kunnie and Dean Tatum had not discriminated against her, Plaintiff wrote:

Dr. Kunnie is not an African. He is a Coloured from South Africa with European, East Indian, and Malaysian ancestry. The Coloureds still think they are better than the Africans . . . . . Dr. Kunnie discriminates against blacks in the United States just like he was accustomed to behaving toward the Africans in South Africa.

Plaintiff also made the following remarks about Dean Tatum:

Dean Tatum's chameleon like racial and ethnic identify has become his trademark. . . . However, even if it is true—as I have heard rumored—that the dean's grandmother was part Mexican–American, with his white skin, European facial features, Anglo–Saxon name; 'Tatum,' and standardized bigoted behavior toward African Americans, no one would ever know he is a 'Mexican American' unless he tells them. Besides, there are many Mexican–Americans . . . who discriminate against blacks.

(Defendants' Exhibit 16, September 4, 1998 letter from Plaintiff to Dean Tatum).

(7th Cir.1995) (employee's sarcastic, argumentative, and condescending behavior, as well as abrasive and aggressive manner of association constitute a legitimate, nondiscriminatory reason for termination).[9]

Evidence was presented that Plaintiff's conduct regarding Prof. Kunnie, Dean Tatum, and others, seriously disrupted the Africana Studies Program and the Department of Humanities. Dean Tatum testified that although he is responsible for seven departments and programs and oversees the administration of 150 professors, he devoted 75% of the time he spent on personnel problems to resolving conflicts within the Africana Studies Program. That program employs four full-time professors.

Accordingly, for purposes of analyzing Plaintiff's request for a mandatory preliminary injunction, Defendants have demonstrated a legitimate, nondiscriminatory reason for not renewing Plaintiff's contract. *See Unt v. Aerospace Corp.,* 765 F.2d 1440, 1446 (9th Cir.1985) ("An employee is not protected by Title VII when he ... knowingly disobeys company orders, disrupts the work environment of his employer, or willfully interferes with the attainment of the employer's goals."). *See also Merrick v. Northern Natural Gas Co.,* 911 F.2d 426, 429–30 (10th Cir.1990) (discharge was proper where the employee was insubordinate to his immediate superior and engaged in a "militaristic" style of communication).

### Pretext

■ Because Defendants have demonstrated a legitimate, nondiscriminatory

reason for not renewing Plaintiff's contract, "the presumption of discrimination drops from this case, ... and the District Court is in a position to decide ... whether the particular employment decision at issue was made on the basis of race." *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 875, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984) (citations omitted). It is Plaintiff's position that Defendants' reasons are pretextual because she was treated differently than similarly situated male colleagues.

The only evidence arguably supporting this position consists of the fact that Profs. Kieta and Dieke engaged in similar conduct, but were not terminated from their positions.[10] This reasoning, however, is flawed. Profs. Kieta and Dieke were not similarly situated colleagues. They are tenured professors. A tenured professor "is assured that the President shall offer an appointment to that individual for each succeeding fiscal or academic year until ... dismiss[al] for just cause, or termination for budgetary reasons."[11] Plaintiff is not tenured. "A non-tenured faculty member has no expectations of continued employment...."[12] The distinction is crucial.

Provost Sypherd testified that he decided not to renew Plaintiff's contract so that order and civility could be restored to the Program. He testified that he could take action against Plaintiff because she was non-tenured, whereas he was limited in his ability to discipline Profs. Kieta and Dieke due to their tenured status.[13]

---

**9.** Evidence was presented that Plaintiff circumvented Acting Director Kunnie and attempted to interact directly with Dean Tatum. (Defendants' Exhibit 2), despite repeated requests by Dean Tatum to deal directly with Prof. Kunnie. (Memorandum in Response to Motion for Preliminary Injunction, Exhibit 3, June 23, 1998 letter to Prof. Ogunleye).

**10.** In a complaint to the Conciliation Committee of the University of Arizona, Plaintiff does allege that Dean Tatum "gave a male faculty member a hiring package that he had previously denied me." (Plaintiff's Exhibit W, at

3). No support for this allegation has been submitted. Without more, this allegation does not support Plaintiff's claim of discrimination.

**11.** The University of Arizona Handbook, Chapt. 3.11.04.

**12.** Arizona Board of Regents Policy Manual, Chapt. 6–201(J)(2)(b).

**13.** Provost Sypherd's comments, noted on the Promotion and Tenure form, regarding his

Therefore, Plaintiff fails to meet her burden in demonstrating that Defendants' legitimate, nondiscriminatory reason was in reality a pretext for gender discrimination.

Plaintiff has also failed to demonstrate that Defendants' proffered justification is a pretext for retaliation against Plaintiff for her role as a witness in Prof. Omari's EEOC proceedings. Provost Sypherd testified that he was unaware that Plaintiff was a participant in Prof. Omari's EEOC proceedings.[14] Dean Tatum recommended renewing Plaintiff's contract.

■ "[A] decision to discipline an employee whose conduct is unreasonable, even though borne out of legitimate protest, does not violate Title VII." *See Jennings v. Tinley Park Community Consol. School Dist., No. 146,* 864 F.2d 1368, 1371–72 (7th Cir.1988). Even if Plaintiff had a reasonable belief that discriminatory conduct had occurred, she was not entitled to engage in "unreasonably hostile or aggressive conduct." *EEOC v. Crown Zellerbach Corp.,* 720 F.2d 1008, 1012 (9th Cir.1983). Accordingly, the evidence presented does not demonstrate a likelihood that Plaintiff will prevail on the merits.

### 3. Irreparable Harm

■ Although Plaintiff has failed to demonstrate a likelihood of success on the merits, the Court must also address the issue of irreparable harm because the standard for issuance of a preliminary injunction involves a balancing test. A strong showing of irreparable harm may provide the basis for the granting of a preliminary injunction despite Plaintiff's failure to demonstrate a likelihood of success on the merits; however, "the required degree of irreparable harm increases as the probability of success decreases." *Oakland Tribune, Inc. v. Chronicle Publishing Co.,* 762 F.2d 1374, 1376 (9th Cir. 1985).

■ Plaintiff argues that she will suffer irreparable harm because her "family will be uprooted with three of her children in high school and her career will be permanently damaged." Loss of employment, however, is not generally sufficient to demonstrate "irreparable injury" because "the requisite irreparable harm is not established in employee discharge cases by financial distress or inability to find other employment, unless truly extraordinary circumstances are shown." *Holt v. Continental Group, Inc.,* 708 F.2d 87, 90 (2d Cir.1983). In *Stanley,* the Ninth Circuit found that a plaintiff who asserted a claim for money damages and back pay for the loss of her job had an adequate remedy at law and could not demonstrate irreparable injury. *See* 13 F.3d at 1320. *See also Duke v. Langdon,* 695 F.2d 1136, 1137 (9th Cir.1983) (plaintiff failed to demonstrate irreparable injury because she could regain her job with back pay if she prevailed on the merits).

Plaintiff has failed to demonstrate irreparable injury.

### CONCLUSION

Plaintiff has failed to demonstrate a likelihood of success on the merits and has also failed to demonstrate irreparable harm should injunctive relief be denied.

Accordingly,

IT IS **ORDERED** that Plaintiff's motion for a preliminary injunction is **DENIED.**

---

decision not to retain Plaintiff stated that "UA cannot afford this faculty member; no legal restriction on terminating." (Defendants' Exhibit 7).

**14.** There is evidence, however, to indicate that Provost Sypherd was aware that Prof.

Omari had filed an EEOC complaint against the University. At the hearing, Plaintiff produced evidence that Provost Sypherd had been sent a copy of a settlement offer regarding Prof. Omari's complaint.