## In re: JDS UNIPHASE CORPO-RATION SECURITIES LIT-IGATION

**This document relates to All Actions**

**No. C–02–1486 CW EDL.**

United States District Court,
N.D. California.

Oct. 18, 2002.

ifornia Code of Civil Procedure § 425.16 or whether the Uniform Single Publication Act

Darren J. Robbins, San Diego, CA, John Frith Stewart, Segal, Stewart, Cutler, Lindsay, Janes & Ber, Louisville, KY, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Pipefitters Local 522 & 633 Pention Trust Fund, Plaintiff.

Christopher T. Heffelfinger, Jennifer Sharon Abrams, Berman DeValerio Pease & Tabacco, P.C., San Francisco, CA, Jonathan M. Plasse, Louis J. Gottlieb, Goodkind Labation Rudoff & Sucharow LLP, New York City, for Connecticut Retirement Plans and Trust Funds, Lead Plaintiff.

Timothy J. Burke, Stull Stull & Brody, Los Angeles, CA, for Edward Cantamount, Consol Plaintiff.

Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, for Jerold Sorensen, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Paul J. Geller, Cauley Geller Bowman & Coates LLP, Boca Raton, FL, Reed R.

bars any of plaintiff's claims.

Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Joel Abrams, Consol Plaintiff.

Alfred G. Yayes, Law Offices of Alfred G. Yates, Pittsburgh, PA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Kimberly Saleik, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Greg Brockwell, Consol Plaintiff.

Darren J. Robbins, Milberg Weiss Bershad Hynes & Lerach LLP, San Diego, CA, Marc S. Henzel, Law Offices of Marc C. Henzel, Bala Cynwyd, PA, Reed R. Kathrein, Milberg Weiss Bershad Hynes & Lerach, San Francisco, CA, for Gene Dolzhansky, Consol Plaintiff.

Gregory M. Egleston, Bernstein Liebhard & Lifshitz LLP, New York City, Lionel Z. Glancy, Glancy Binkow LLP, Los Angeles, CA, Mel E. Lifshitz, Bernstein Liebhard & Lifshitz, LLP, New York City, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, for John F. Raymond, Pond Equities, Consol Plaintiffs.

Jennifer Sharon Abrams, Berman, De Valerio Pease Tabacco Burt & Pucillo, San Francisco, CA, Steven J. Toll, Cohen Milstein Hausfeld & Toll, PLLC, Seattle, WA, for Gary T. Grabar, Consol Plaintiff.

Jacqueline Sailer, Rabin & Peckel LLP, New York City, Joseph J. Tabacco, Jr., Berman DeValerio Pease Tabacco Burt & Pucillo, San Francisco, CA, for Hene Armour, Consol Plaintiff.

Behram V. Parekh, Weiss & Yourman, Los Angeles, CA, Jordan L. Lurie, Weiss & Yourman, Los Angeles, CA, Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Stull, Stull & Brody, Los Angeles, CA, for Martin Hacker, Consol Plaintiff.

Betsy C. Manifold, Francis A. Bottini, Jr., Francis M. Gregorek, Wolf Haldenstein Adler Freeman & Herz, San Diego, CA, for L. A. Murphy, Consol Plaintiff.

Andrew Schatz, Schatz & Nobel, P.C., James Albert Caputo, Spector Roseman & Kodroff, PC, San Diego, CA, Patrick A. Klingman, Schatz & Nobel P.C., Hartford, CT, for John Erisman, Harriet Goldstein, Consol Plaintiffs.

Michael Donovan, Donovan Searles, LLC, Paul J. Scarlato, Weinstein Kitchenoff Scarlato & Goldman, Philadelphia, PA, for Saffi Omar, Consol Plaintiff.

Jules Brody, Stull Stull & Brody, New York City, Kevin J. Yourman, Weiss & Yourman, Los Angeles, CA, Michael D. Braun, Timothy J. Burke, Stull, Stull & Brody, Los Angeles, CA, for Steven Cantamount., Consol Plaintiff.

Laurence D. King, Kaplan Fox & Kilsheimer LLP, San Francisco, CA, for Seymour Halpern, Consol Plaintiff.

John Emerson, The Emerson Firm, Houston, TX, for Victor Cape, Consol Plaintiff.

David R. Scott, James E. Miller, Scott & Scott LLC, Colchester, CT, for Rudolf Skubella, Consol Plaintiff.

Deborah R. Gross, Law Offices of Bernard M. Gross, PC, Philadelphia, PA, for Ralph Kirk, Consol Plaintiff.

Curtis V. Trinko, Law Offices of Curtis V. Trinko, New York City, for Warren C. Sterrett, Consol Plaintiff.

William B. Federman, Dreier Baritz & Federman, Oklahoma City, OK, for Larry Thomas, Consol Plaintiff.

Elizabeth E. Leland, Juli F. Desper, Lynn Lincoln Sarko, Keller Rohrback L.L.P., Seattle, WA, for Grover Ellis, Linda Raybine, Consol Plaintiffs.

Jeffrey Neiman, The Neiman Law Firm, Brooklyn, NY, Joseph P. Garland, Klein &

Solomon LLP, Kenneth A. Elan, Law Offices of Kenneth A. Elan, New York City, Lionel Z. Glancy, Glancy & Binkow LLP, Mel Urbach, Law Offices of Mel Urbach, Jersey City, NJ, Michael M. Goldberg, Glancy & Binkow LLP, Los Angeles, CA, for Aaron Jungreis, Consol Plaintiff.

Barbara A. Podell, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA, Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Sherrie R. Savett, Berger & Montague, P.C., Philadelphia, PA, Solomon B. Cera, Gold Bennett Cera & Sidener LLP, San Francisco, CA, for Leonard Sollins, Consol Plaintiff.

Karen M. Hanson, Lockridge Grindal Nauen P.L.L.P., Minneapolis, MN, for Michael Salter, Consol Plaintiff.

Bruce D. Oakes, Law Office of Bruce D. Oakes, St. Louis, MO, for Richard Reinsich, Consol Plaintiff.

Joseph M. Barton, Gold Bennett Cera & Sidener LLP, San Francisco, CA, Mark S. Willis, Matthew J. Ide, Cohen Milstein Hausfeld & Toll PLLC, Washington, DC, for Houston Municipal Employees Pension System, Consol Plaintiff.

Joseph M. Barton, Gold Bennett Cera & Sidener LLP, Solomon B. Cera, San Francisco, CA, Mark S. Willis, Steven J. Toll, Cohen Milstein Hausfeld & Toll, P.L.L.C., Seattle, WA, for Houston Municipal Employees Pension System, Consol Plaintiff.

Aaron H. Darsky, Schubert & Reed LLP, San Francisco, CA, Andrew J. Morganti, Donald J. Enright, Finkelstein Thompson & Loughran, Washington, DC, for Paul Hesano, Consol Plaintiff.

Christopher J. Gray, Christopher Lovell, Lovell & Stewart, LLP, New York City, for Suresh Khanna, Consol Plaintiff.

Aaron H. Darsky, Schubert & Reed LLP, San Francisco, CA, Carol V. Gilden, Michael E. Moskovitz, Much Shelist

FreedDeneberg Ament & Rub, Chicago, IL, Juden Justice Reed, Robert C. Schubert, Willem F. Jonckheer, Schubert & Reed LLP, San Francisco, CA, for Steven J. Greenfogel, Mike Gray, Consol Plaintiffs.

Juli F. Desper, Keller Rohrback LLP, Seattle, WA, Timothy J. Burke, Stull Stull & Brody, Los Angeles, CA, for Edwin Cancilla, Movant.

Holly H. Tambling, Morrison & Foerster LLP, Terri Garland, Morrison & Foerster, San Francisco, CA, for JDS Uniphase Corporation, Jozef Straus, Anthony R. Muller, Charles J. Abbe, Defendants.

Holly H. Tambling, Morrison & Foerster LLP, San Francisco, CA, Howard S. Caro, Michael L. Charlson, Heller Ehrman White & McAuliffe LLP, Menlo Park, CA, Michael J. Shepard, Heller Ehrman White & McAuliffe LLP, San Francisco, CA, for Kevin Kalkhoven, Defendant.

Holly H. Tambling, Morrison & Foerster LLP, San Francisco, CA, for Dan E. Pettit, M. Zita Cobb, Joseph Ip, Frederick Leonberger, Michael C. Phillips, Donald R. Scrifes, Casimir S. Skrzypczak, Peter A. Guglielmi, Robert E. Enos, Bruce D. Day, Martin A. Kaplan, Defendants.

Angela N. O'Rourke, Joseph A. Meckes, Mark C. Dosker, Squire Sanders & Depsey LLP, San Francisco, CA, Daniel L. Bockett, Squire Sanders & Depsey LLP, Cleveland, OH, for The Furukawa Electric Co., Ltd., Defendant.

## ORDER GRANTING IN PART LEAD PLAINTIFF'S MOTION TO LIMIT THE SCOPE OF CONFIDENTIALITY AGREEMENTS SIGNED BY FORMER JDS UNIPHASE EMPLOYEES

LAPORTE, United States Magistrate Judge.

In this securities action, lead plaintiff Connecticut Retirement Plans and Trust

Funds ("Connecticut") moves to limit the scope of confidentiality agreements signed by former employees of defendant JDS Uniphase Corporation ("JDSU"). For the reasons set forth below, the motion is granted, with modifications.

## I. Background

As lead plaintiff in this action, Connecticut has been investigating acts of JDSU and the individual defendants relating to alleged artificial inflation of the price of JDSU securities during the putative class period of July 27, 1999 through July 26, 2001. Investigators hired by lead counsel have identified and have spoken with numerous former employees of JDSU. Many of these former employees have informed the investigators that they are willing to talk about relevant activities at JDSU during the class period, but they believe they are unable to do so because of one or more confidentiality agreements that they entered into with JDSU (or with companies later acquired by JDSU) at the time they were hired, at the time they were terminated, or both.

One such agreement is entitled "Employee Proprietary Information and Inventions Agreement." (Gottlieb Decl., Ex. A.) That agreement provides, in relevant part:

(a) *Confidential Restrictions.* I understand that, in the course of my work as an employee of the Company, I [have had and] may have access to Proprietary Information (as defined below) concerning the Company. I acknowledge that the Company has developed, compiled, and otherwise obtained, often at great expense, this information, which has great value to the Company's business. I agree to hold in strict confidence and in trust for the sole benefit of the Company all Proprietary Information and will not disclose any Proprietary Information, directly or indirectly, to anyone outside of the Company, or use, copy, publish, summarize, or remove from Company premises such information (or remove from the premises any other property of the Company) except (i) during my employment to the extent necessary to carry out my responsibilities as en employee of the Company or (ii) after termination of my employment, as specifically authorized in writing by a duly authorized officer of the Company. I further understand that the publication of any Proprietary Information through literature or speeches must be approved in advance in writing by a duly authorized officer of the Company.

(b) *Proprietary Information Defined.* I understand that the term "Proprietary Information" in this Agreement means all information and any idea in whatever form, tangible or intangible, whether disclosed to or learned or developed by me, pertaining in any manner to the business of the Company or to the Company's affiliates, consultants, or business associates, unless (i) the information is or becomes publicly known through lawful means; (ii) the information was rightfully in my possession or part of my general knowledge prior to my employment by the Company; or (iii) the information is disclosed to me without confidential or proprietary restriction by a third party who rightfully possesses the information (without confidential or proprietary restriction) and did not learn of it, directly or indirectly, from the Company. I further understand that the Company considers the following information to be included, without limitation, in the definition of Proprietary Information: (A) notebooks, schematics, techniques, employee suggestions, development tools and processes, computer printouts, computer programs, design drawings and manuals, and improvements; (B) information about costs, profits, markets, and sales; (C) plans for future development and new product concepts; and (D) all documents, books,

papers, drawings, models, sketches, and other data of any kind and description, including electronic data recorded or retrieved by any means, that have been or will be given to me by the Company (or any affiliate of it), as well as written or verbal instructions or comments.

(*Id.* at 1.)

Another such agreement is entitled "Separation Agreement and General Release." (Gottlieb Decl., Ex. B.) That agreement provides, in relevant part:

You agree to return all Company property, including, without limitation, all books, manuals, records, reports, notes, contracts, lists, blueprints, and other documents, or materials, or copies thereof, and equipment furnished to or prepared by you in the course of or incident to your employment. You also acknowledge and reaffirm your continuing obligations under the Proprietary Information Agreement you signed with the Company on original date of hire.

... You also agree that this Agreement is confidential and that you will not discuss it, or any of its terms, with anyone without the Company's prior consent, except your spouse and to any legal or financial advisors for legitimate business reasons, or as otherwise compelled by law. Further, you agree that you will not make or publish, either orally or in writing, any disparaging statement regarding the Company, its employees, clients, vendors, or customers, or in any way impede or interfere with the Company's customer relationships.

(*Id.* at 2.)

A third agreement is entitled "E–Tek Dynamics, Inc. Proprietary Information and Inventions Agreement." (Macika Decl., Ex. A.) That agreement provides, in relevant part:

a. *Definition* Employee acknowledges and agrees that Employee has obtained or may now or hereafter obtain from the Company certain of the Company's confidential information, which confidential information includes but is not limited to all of the Company's (i) past, present and future research, (ii) business, development and marketing plans, (iii) customer lists and customer relationships, (iv) prices (except where publicly disclosed by the Company) and pricing strategies, (v) secret inventions, processes, methods and specifications, (vi) compilations of information (including without limitation studies, records, reports, drawings, memoranda, drafts and any other related information), (vii) trade secrets, (viii) product development proposals, and (ix) other ideas, concepts, strategies, designs, suggestions and recommendations relating without limitation to any of the foregoing or to any product developed or proposed to be developed by the Company or by the Employee and/or others for the Company (collectively, the "Confidential Information"). Employee further acknowledges and agrees that the Company is the owner of all such Confidential Information, any copies thereof, and of all copyright, trade secret, patent, trademark and other intellectual or industrial property rights therein or associated therewith. Employee understands and agrees that the unauthorized use or disclosure of the Confidential Information and any of the Company's related intellectual and industrial property rights constitutes unfair competition, and promises not to engage in any unfair competition with the Company during Employee's employment or at anytime thereafter.

b. *Term.* Employee agrees that for a period of five (5) years following either the disclosure to Employee of any of the Company's Confidential Information or the termination of Employee's employment with the Company, whichever is last to occur, Employee will not disclose

said information or any portion thereof to any person, firm, corporation or other entity, or make use of such information in any way without the Company's prior written consent, or reverse engineer, decompile, or disassemble any of the Company's products without such consent. (*Id.* at 1.)

## II. Discussion

Connecticut argues that the Court should limit the scope of these agreements and any other confidentiality agreements between JDSU and its former employees so that they would not prohibit former JDS Uniphase employees from responding to questions posed by investigators for Lead Plaintiff and/or by Lead Counsel related to the alleged securities fraud. No proposed order has been submitted. Connecticut contends that to the extent JDSU seeks to use the agreements for purposes other than the protection of trade secrets, the agreements are unduly broad and should be deemed void as against public policy. Alternatively, Connecticut requests "that the Court: (a) grant plaintiffs permission to depose a limited number of former JDS Uniphase employees prior to the Court's decision on the motion to dismiss, or (b) grant plaintiffs an adverse inference that, despite public disclosures to the contrary, defendants were aware of the Company's sharply declining financial condition and results prior to their selling of more than one billion dollars' worth of Company stock." (Motion at 12.)

### A. The Reform Act's ban on discovery during the pendency of a motion to dismiss does not bar plaintiffs' motion

JDSU argues that Connecticut's motion is an impermissible attempt to evade the statutory restrictions on early discovery that are imposed by the Private Securities Litigation Reform Act of 1995 ("Reform Act").[1] The purpose of the Reform Act was "to restrict abuses in securities class-action litigation, including: (1) the practice of filing lawsuits against issuers of securities in response to any significant change in stock price, regardless of defendants' culpability; (2) the targeting of "deep pocket" defendants; (3) the abuse of the discovery process to coerce settlement; and (4) manipulation of clients by class action attorneys." *SG Cowen Securities Corporation v. United States District Court for the Northern District of California*, 189 F.3d 909, 911 (9th Cir.1999) (quoting *In re Advanta Corp. Secs. Litig.*, 180 F.3d 525, 530–31 (3d Cir.1999)). The Reform Act instituted a heightened pleading standard, and "mandated a stay of discovery during the pendency of a summary judgment or dismissal motion." *Id.*

Under the Reform Act, "all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party." 15 U.S.C. § 78u–4(b)(3)(B). This section was "intended to prevent unnecessary imposition of discovery costs on defendants." *SG Cowen*, 189 F.3d at 911 (citing H.R. Conf. Rep. No. 104–369, 104th Cong. 1st Sess. at 32 (1995), reprinted in 1995 U.S.C.C.A.N. Sess. 731). The Ninth Circuit has held that the Reform Act's discovery stay provision "clearly contemplates that 'discovery should be permitted in securities class actions *only after the court has sustained the legal sufficiency of the complaint.*' " *Id.* at 912 (quoting S.Rep. No. 104–98, at 14

---

1. The Court has also received an opposition brief from defendant The Furukawa Electric Co. Ltd. ("Furukawa"), which correctly notes that they are not a party to the confidentiality agreements at issue, and thus Connecticut's references to "defendants" should not be taken to include Furukawa.

(1995), reprinted in U.S.C.C.A.N. 693). Thus, the Ninth Circuit has construed the Reform Act's discovery stay to apply not only during the pendency of a motion to dismiss, but until the Court has sustained the legal sufficiency of the complaint.

Here, there is no motion to dismiss pending, but the time for responding to the consolidated complaint has not yet elapsed. On September 12, Judge Wilken signed a stipulation granting defendants until December 9 to respond to the consolidated complaint. JDSU's counsel indicated at the hearing that they are likely to file a motion to dismiss. As the Court has not yet sustained the legal sufficiency of the consolidated complaint, plaintiffs are not yet entitled to take discovery. Accordingly, under the Ninth Circuit's interpretation of the Reform Act in *SG Cowen*, plaintiffs are not yet entitled to take discovery. *Id.*

There are two exceptions to the Reform Act's discovery stay. Discovery is stayed "unless the courts finds upon the motion of any party that particularized discovery is necessary to preserve evidence or to prevent undue prejudice." With respect to the first exception, there is not a hint of a suggestion in the plaintiff's papers that there is an urgent need to preserve evidence. As for the second exception, the Ninth Circuit has held that a plaintiff's inability, without discovery, to obtain the facts needed to meet the Reform Act's heightened pleading requirements is not the sort of "undue prejudice" contemplated by the Reform Act. *SG Cowen*, 189 F.3d at 913.

> The Act requires the trial court to dismiss the complaint if it fails to satisfy the Act's heightened pleading standards. *See* § 78u–4(b)(3)(A). Thus, as a matter of law, failure to muster facts sufficient to meet the Act's pleading requirements cannot constitute the requisite "undue prejudice" to the plaintiff justifying a lift

of the discovery stay under § 78u–4(b)(3)(B). To so hold would contravene the purpose of the Act's heightened pleading standards.

*Id.* Thus, plaintiffs have not shown any justification for lifting the Reform Act's discovery stay to allow them to take depositions before the Court rules on the upcoming motion to dismiss.

By filing this motion, however, plaintiffs are not seeking discovery in the ordinary sense of the word. In essence, what the plaintiffs are asking for is an order from the Court allowing former JDSU employees to speak voluntarily to plaintiffs' lead counsel about certain topics without fear of breaching JDSU's confidentiality agreements. This is not discovery, because plaintiffs are not using court process to require these third parties to provide information about the lawsuit. Instead, plaintiffs are merely seeking an order that would allow former employees to speak voluntarily if they wish to do so.

JDSU argues, however, that Connecticut's motion falls within the scope of the Reform Act's stay of "all discovery *and other proceedings.*" 15 U.S.C. § 78u–4(b)(3)(B) (emphasis added). In *Medhekar v. United States District Court*, 99 F.3d 325 (9th Cir.1996), the Ninth Circuit was asked to determine whether initial disclosures are stayed under the Reform Act during the pendency of a motion to dismiss. The court held that initial disclosures are discovery, and therefore are included in the Reform Act's stay of discovery until the district court upholds the complaint. *Id.* The court then went on to hold that even if initial disclosures are not the same as discovery, they are at a minimum included in the Reform Act's stay of "discovery and other proceedings." *Id.* In defining the term "other proceedings," the Ninth Circuit held that "[g]iven the context and legislative history of the Act, it

appears that the term was intended to include litigation relating to discovery, which would certainly include disclosures and would not, as real party fears, include all litigation activity in general." *Id.*

Here, however, Connecticut does not seek discovery, but merely seeks a ruling on the scope of JDSU's confidentiality agreements with its former employees, so that it may speak with former employees who wish to voluntarily cooperate with Connecticut's investigation. Unlike discovery and initial disclosures, these interviews are not compelled by the Federal Rules of Civil Procedure. Neither the former employees nor the defendants are required to participate in these interviews in any way. The Court agrees with *In re Tyco International Ltd. Securities Litigation,* 2001 U.S. Dist. Lexis 819 (D.N.H. 2001), in which the district court declined to prohibit voluntary discussions between plaintiffs and third party witnesses because "[n]either logic, tradition, the constitution nor the PSLRA prohibit interviewing prospective witnesses." *Id.* at *8. In fact, the Reform Act's heightened pleading standard encourages plaintiffs to do *more* investigation before filing a complaint, not less.

*In re Flir Systems Inc. Securities Litigation,* 2000 WL 33201904 (D.Or.2000) is also instructive. In *Flir,* the court was asked to permit a deposition of Palmquist, a former employee of the defendant, during the discovery stay. The court distinguished *SG Cowen* by noting that discovery was not being sought against the defendant, but against a third party, and thus the discovery would not impose any significant burden on the defendant. *Id.* at *2. Because Palmquist had filed a civil complaint in state court alleging accounting fraud by the defendant, the court found that the proposed discovery was not a mere fishing expedition. *Id.* The court also noted that the only reason Palmquist would not talk to the plaintiffs voluntarily was that defendants were asserting a confidentiality provision in Palmquist's employment contract. *Id.* at *3. The court found that the Reform Act "is a shield intended to protect security-fraud defendants from costly discovery requirements, [citation omitted], not to be a sword with which defendants can destroy the plaintiffs' ability to obtain information from third parties who are otherwise willing to disclose it." *Id.* It is questionable whether *Flir*'s holding that plaintiffs could depose Palmquist is consistent with *SG Cowen.* The Court agrees, however, with the *Flir* court's conclusion that the Reform Act was not intended to provide defendants with the means to bar all investigation into their conduct. The Reform Act was not intended to provide defendants with immunity from suit, but, rather, was intended to protect defendants from the burdens of defending against frivolous litigation.

Plaintiffs' proposed interviews with former employees of JDSU do not impose any burden or cost on JDSU. The Court finds that plaintiffs' proposed voluntary interviews with former employees do not fall within the scope of "discovery." Accordingly, the Reform Act's ban on discovery during the pendency of a motion to dismiss has no application to plaintiffs' motion.

## B. The merits of plaintiffs' motion

Connecticut states that it has no interest in any information that could be construed as a trade secret, and is willing to discuss reasonable measures to accommodate any legitimate concerns of JDSU with respect to use of the information obtained from former employees in the course of its investigation. In Connecticut's reply brief, it provides examples of the types of questions that it wishes to ask former employees, all of which relate directly to the

allegations of wrongdoing that are at issue in this case. None of these questions appears to implicate any trade secrets of JDSU, or any other ·information that JDSU can legitimately claim is confidential. Thus, contrary to JDSU's attempts at misdirection, the issue is not whether JDSU can lawfully enter into contracts with its employees to protect its confidential business information and trade secrets. Connecticut concedes that such agreements are lawful. Instead, the issue is whether JDSU's confidentiality agreements can lawfully be used to prohibit its former employees from providing whistleblower-type information about allegedly unlawful acts that occurred during their employment with JDSU.

In *Chambers v. Capital Cities/ABC,* 159 F.R.D. 441 (S.D.N.Y.1995), an age discrimination case, plaintiffs' counsel wished to interview former employees of the defendant. Plaintiffs sought an order authorizing them to inform those former employees that they could safely disregard agreements with the defendant not to disclose various types of information. The court recognized the legitimacy of agreements between employers and employees that are designed to protect dissemination of confidential information. *Id.* at 444. The court also held, however, that:

> It has been recognized that at least in some circumstances, agreements obtained by employers requiring former employees to remain silent about underlying events leading up to disputes, or concerning potentially illegal practices when approached by others can be harmful to the public's ability to rein in improper behavior, and in some contexts ability of the United States to police violations of its laws. Absent possible extraordinary circumstances not present here, it is against public policy for parties to agree not to reveal, at least in the limited contexts of depositions or pre-deposition interviews concerning litiga-

tion arising under federal law, facts relating to alleged or potential violations of such law.

*Id.* (footnote omitted). The Court also noted that "agreements restricting former employee revelation of events in the workplace which are not privileged but may involve violations of federal law have the effect of 'hindering' implementation of the 'Congressionally mandated duty to enforce the provisions' of federal statutes." *Id.* (quoting *EEOC v. United States Steel,* 671 F.Supp. 351, 357 (E.D.Pa.1987)). The court declined to authorize plaintiffs' counsel to tell former employees that they need not be concerned about the confidentiality agreements, however, because such a remedy "would make plaintiff's counsel the decisionmaker concerning what confidentiality requirements were related to genuine trade secrets or other legitimately privileged information, and which dealt with concealment of information relating to potential improprieties on the part of the employee." *Id.* at 445. Instead, it ordered the defendant to either (1) notify all former employees whom plaintiff wanted to interview, in writing, that no unfavorable consequences for the employees would flow from providing information to plaintiffs' counsel about specific subjects, or (2) accept an adverse inference that the information, if disclosed, would be contrary to defendant's position. *Id.*

> If applied to depositions or pre-deposition interviewing with respect to litigation under federal substantive law, agreements calling or appearing to call for silence concerning matters relevant to alleged legal violations, whether or not such agreements are sought to be enforced, inherently chill communication relevant to the litigation. Where conduct of a party tends to preclude availability of information relevant to a litigation and where no genuine basis for keeping that information confidential ex-

ists, a court or factfinder may infer that the information, if disclosed, would be contrary to the position of the party engaging in such conduct.

*Id.*

Another case from the Southern District of New York also held that "[d]isclosures of wrongdoing do not constitute revelations of trade secrets which can be prohibited by agreements binding on former employees." *McGrane v. The Reader's Digest Association, Inc.,* 822 F.Supp. 1044, 1052 (S.D.N.Y.1993). That court also noted that "[c]ourts are increasingly reluctant to enforce secrecy arrangements where matters of substantial concern to the public—as distinct from trade secrets or other legitimately confidential information—may be involved." *Id.* at 1046.

Congress has also indicated a public policy in favor of whistleblowers in securities cases. The recently enacted Sarbanes–Oxley Act of 2002 prohibits companies from discriminating against employees because of any lawful act by the employee to assist in an investigation of securities fraud. 18 U.S.C. § 1514A(a)(1). At oral argument, defendants correctly pointed out that this section only applied to investigations conducted by the government, or by the company itself. Nonetheless, the statute demonstrates the public policy in favor of allowing even current employees to assist in securities fraud investigations. It certainly does not establish a public policy in favor of allowing employers to muzzle their employees with overbroad confidentiality agreements.

Other than their argument that plaintiffs are attempting to circumvent the discovery stay provision of the Reform Act, JDSU provides very few specific arguments against plaintiff's motion, relying instead primarily on straw-man arguments about the validity of confidentiality agreements in general. JDSU argues that it used several types of agreements containing provisions designed to protect its confidential and competitively sensitive business information, and that the form of those agreements evolved over the years. (DeWees Decl. ¶¶ 10, 14.) JDSU does not state, however, that these agreements differed in any material way from the sample agreements provided by Connecticut. In any event, the issue is not about the specific language of any of these agreements, but whether JDSU can ever enforce these types of agreements against former employees to prevent them from providing non-tradesecret, unprivileged information about JDSU's allegedly illegal activities.

JDSU does point to *Patton v. Cox,* 276 F.3d 493 (9th Cir.2002), however, which arguably provides some support to JDSU's position. In that case, a doctor, Cox, conducted a court-ordered psychological examination of the plaintiff, Patton, allegedly pursuant to an oral agreement with Patton to keep the results of the examination confidential. *Id.* at 494. Patton and his former wife were involved in a bitter child custody dispute, and Patton's teenage sister-in-law had alleged that Patton had engaged in improper sexual conduct with her. *Id.* at 494, 501. Patton was also a doctor, and as a result of his sister-in-law's allegations, the Arizona Board of Medical Examiners ("BOMEX") filed a complaint against him for unprofessional conduct and unfitness to practice medicine. *Id.* at 494. Dr. Cox voluntarily testified at the BOMEX hearing, and revealed that as a result of his examination of Patton, he believed that Patton was a pedophile and a danger to children. *Id.* at 495. Patton then sued Dr. Cox for breach of contract. *Id.*

The district court granted Dr. Cox's motion to dismiss on the ground that absolute witness immunity precluded any liability arising from Dr. Cox's testimony at a quasi-judicial hearing. *Id.* The Ninth Circuit

reversed, applying Arizona law. The Court recognized that Dr. Cox served the public interest by bringing to light the potential danger facing Patton's young, female patients. *Id.* at 498. Nonetheless, the court concluded that:

> applying our perception of Arizona law, we hold that witness immunity does not bar an action for breach of contract when, as in this case, the witness participated voluntarily in a quasi-judicial proceeding. This ruling will not hinder "the resolution of disputes and the ascertainment of truth," [citation omitted] because witnesses can be compelled to testify as needed, which would then trigger immunity protection.

*Id.* at 500. The Ninth Circuit noted that because Dr. Cox voluntarily entered into the confidentiality agreement, "[h]e chose to limit his ability to share information he obtained about Dr. Patton, and he was not at liberty to breach his obligation even if he felt it was in the public's best interest to do so." *Id.*

The Ninth Circuit did not discuss whether such agreements would be unenforceable in violation of public policy, and thus *Patton* does not directly conflict with *Chambers.* Nonetheless, by holding that the public interest did not trump Cox's confidentiality agreement with Patton, a reasonable argument could be made that the Ninth Circuit would not find the confidentiality agreements at issue here to be in violation of public policy, at least under Arizona law. This Court, of course, is applying federal law. *Patton* is also distinguishable because, unlike the instant case, *Patton* involved disclosure of private medical information, which is at the core of an individual's right to privacy. *See id.* ("we cannot help but consider the reasonable expectation of Dr. Patton that this extremely private information would not be disseminated beyond the scope of the Utah court order.") Highly personal medical information is the sort of information, like

trade secrets, that a party unquestionably has the right to ask another party to keep confidential.

Here, however, JDSU's confidentiality agreements are so broad that they cover information that cannot possibly be considered confidential. To the extent that those agreements preclude former employees from assisting in investigations of wrongdoing that have nothing to do with trade secrets or other confidential business information, they conflict with the public policy in favor of allowing even current employees to assist in securities fraud investigations.

In addition, one of the agreements, entitled "Separation Agreement and General Release," bars former employees who signed it from making "any disparaging statement" about the company, its clients, vendors or customers. Unlike the agreement at issue in *Patton,* which the court found was voluntarily entered into, plaintiffs stated at the hearing that this agreement was imposed on a former employee in a mass layoff as a condition of receiving severance benefits. Defense counsel acknowledged that plaintiffs' characterization may be correct. To the extent that this agreement can be read to prohibit an employee from providing any information about any wrongdoing by JDSU, it is plainly unenforceable.

Accordingly, the Court finds that *Chambers* is more applicable here than *Patton.* The Court agrees with the *Chambers* court that JDSU cannot use its confidentiality agreements to chill former employees from voluntarily participating in legitimate investigations into alleged wrongdoing by JDSU. JDSU unquestionably has a legitimate interest in preventing dissemination of trade secrets and confidential business information, however. In order to properly balance these competing interests between Connecticut and JDSU, the Court

also agrees with the *Chambers* court that the appropriate remedy is not to allow plaintiffs to be the sole arbiters of whether their investigation avoids infringing on legitimate confidentiality concerns.

The Court finds that the procedural restrictions imposed in *Chambers* are unduly cumbersome and elaborate, however. Rather than requiring the defendants to provide written notice to all former employees that plaintiff wished to interview, or accept an adverse inference, as in *Chambers*, the Court will simply rule that answering the questions set forth in plaintiffs' reply brief and the additional question requested at the hearing do not violate JDSU's confidentiality agreements. In addition, the Court will require the parties to enter into a protective order providing that any information plaintiffs learn during the course of these interviews may be used only for purposes of this litigation. This will be far less intimidating to the former employee, and far less intrusive to the plaintiffs' investigation, than requiring the plaintiffs to provide JDSU with the name of each person they wish to interview and requiring JDSU's counsel to attend each interview. By issuing this order restricting the interviews to the questions that plaintiffs have requested, and to narrow followup questions on those topics, the risk that the interviews will expand into areas of legitimate concern to JDSU is minimized.

### III. Conclusion

For the reasons set forth above, the Court grants Connecticut's motion to limit the scope of confidentiality agreements signed by former JDSU employees, with the following restrictions:

1. All former employees of JDSU may answer the following questions, and any followup questions on the same topic, without fear of breaching any confidentiality agreement with JDSU:

a. At what time during the Class Period did you become aware of a significant downturn in JDSU sales or sale/revenue projections?

b. Do you have any reason to believe that JDSU managers, officers or directors became aware of that downtown in sales or projections at any time during the Class Period?

c. At what time during the Class Period did you become aware of a significant decrease in purchasing (including cancellation or modification or contracts) by JDSU?

d. Do you have any reason to believe that JDSU managers, officers or directors became aware of that downturn in purchasing (or cancellation or modification of contracts) by JDSU?

e. At what time during the Class Period did you become aware of a downturn in JDSU's production needs, e.g., eliminating work shifts, reducing overtime, instituting a hiring freeze?

f. At what time during the Class Period did you become aware of significant decrease in JDSU inventory?

g. Do you have any reason to believe that JDSU managers, officers or directors became aware of that inventory increase at any time during the Class Period?

h. At what time during the Class Period did you become aware of any inventory obsolescence problems at JDSU?

i. Do you have any reason to believe that JDSU managers, officers or directors became aware of that inventory obsolescence problem at any time during the Class Period?

j. Are you aware of any reason why any JDSU managers, officers or directors sold their JDSU stock during the Class Period?

2. In answering these questions, former JDSU employees should not disclose any information protected by the attorney-client privilege, nor should they disclose any confidential business methods used by JDSU.

3. Any information plaintiffs learn during the course of their interviews with former JDSU employees may be used only for purposes of this litigation.

4. Plaintiffs have not demonstrated that they are entitled to take any depositions prior to the Court's decision on the upcoming motion to dismiss.

5. Plaintiffs have not shown that they are entitled to an inference that, despite public disclosures to the contrary, defendants were aware of JDSU's sharply declining financial condition and results prior to their selling of more than one billion dollars' worth of Company stock.

IT IS SO ORDERED.