**Baljit SAINI, Plaintiff,**

v.

**INTERNATIONAL GAME
TECHNOLOGY,
Defendant.**

No. 3:05–CV–00253–ECRVPC.

United States District Court,
D. Nevada.

May 16, 2006.

Kenneth J. McKenna, Reno, NV, for Plaintiff.

Bruce R. Laxalt, Angela Bader, and Janice H. Jensen, Laxalt & Nomura, Ltd., Reno, NV, for Defendant or Respondent.

## ORDER

EDWARD C. REED, JR., District Judge.

Defendant and Counterclaim Plaintiff International Game Technology ("IGT") moves for a preliminary injunction ordering Plaintiff and Counterclaim Defendant Baljit Saini ("Saini") to refrain from disclosing confidential information and trade secrets in violation of two confidentiality agreements with IGT and to return confidential and proprietary documents that Saini removed from IGT.

For the reasons stated below, IGT's motion will be **GRANTED**.

## I. Procedural Background

On April 27, 2005, Saini filed a Complaint and Jury Demand (# 2) alleging race and age discrimination and wrongful discharge. On September 30, 2005, IGT filed counterclaims (# 20) alleging breach of contract by Plaintiff and counterclaim Defendant Baljit Saini ("Saini"). On September 14, 2005, IGT filed the current Motion for Preliminary Injunction (# 16). Saini opposed (# 19) on September 28, 2005, and IGT replied (# 21) to the opposition on October 17, 2005. On April 27, 2006, we heard oral arguments and received additional evidence. Having examined the submitted evidence and considered the arguments, we now rule on the motion (# 16).

## II. Factual Background

IGT's request for a preliminary injunction stems from Saini's alleged breach of a confidentiality agreement he entered into while an employee of IGT. IGT hired Saini as a technical trainer on July 14, 1997. (Complaint ¶ 4.) Saini entered into an Invention and Secrecy Agreement with IGT prior to starting his employment, on June 23, 1997. (Ex. A.)

As part of the Invention and Secrecy Agreement, Saini agreed to the following confidentiality provisions:

(a) That during his employment and thereafter he will hold in strictest confidence, and not disclose to any person, firm, or corporation, without the express written authorization of an officer of [IGT] any information, manufacturing technique, process, formula, development or experimental work, work in process, business, trade secret, or any other secret or confidential matter relating to the products, sales, or business of [IGT] or its affiliates or subsidiaries except as such disclosure or use may be required in

connection with [Saini's] work for [IGT].

. . . . .

(e) That upon request or at the time of leaving the employ of [IGT], he will deliver to [IGT], and not keep or deliver to anyone else, any and all drawings, blueprints, notes, memoranda, specifications, devices, documents, and in general any and all materials relating to [IGT]'s business.

(f) To regard and preserve as confidential all information obtained by Saini pertaining to [IGT]'s business and products, whether patented or unpatented, and not to publish or disclose to others during the term of employee's employment or thereafter such confidential information obtained while in the employ of company.

(*Id.*)

Later, on June 19, 2000, Saini entered into an "Employee Incentive Stock Option Agreement" (Ex. B) contained the following additional confidentiality clause:

... nor shall the Employee at any time after termination disclose, discuss, copy, or otherwise use or suffer to be used, in any manner, in competition with or contrary to the interests of the corporation or any of its subsidiaries, the customer list, product research, engineering data or other trade secrets of the Corporation or any of its subsidiaries.

(*Id.*)

On March 12, 2004, IGT fired Saini. (Complaint ¶ 20.) Saini contends his termination was motivated by race and age discrimination. (*Id.* ¶¶ 4–24.) IGT alleges that it terminated Saini because it suspected he was removing confidential information from IGT without permission. (Countercl. ¶¶ 8–41.) Saini acknowledges that IGT informed him that it believed he was taking documents without permission when it terminated him. (Saini Dep. 33:19–22, Dec. 16, 2005 (Ex. J).)

In April or May of 2004, Saini read about a breach of contract dispute between IGT and The Siena Hotel Spa and Casino ("The Siena") in a newspaper. (Saini Dep. 34:23–35:24, Dec. 16, 2005 (Ex. J); *see also* Def.'s Mot. for Prelim. Inj. ("Mot.") 3 (citing *Int'l Game Tech. v. Wild Game Ng, LLC dba The Siena Hotel Spa and Casino,* CV–04–02590 (2d Dist.Nev)).) In that case, IGT sued The Siena to collect on unpaid invoices, and The Siena responded by asserting that the products in question were defective. (Mot.3.) Saini needed a job, so he contacted The Siena's owner, stating that he had an opinion of the causes for the defective equipment. (Saini Dep. 35:6–24, Dec. 16, 2005 (Ex. J).) Saini has admitted that he would not have offered his services to The Siena if IGT had settled his employment suit. (*Id.* 36:7–9.)

Saini subsequently entered into an expert witness agreement with The Siena and provided The Siena with an expert report and deposition testimony in support of its case. (Saini Expert Report (Ex. D); Saini Dep., Feb. 8, 2006 (Ex. H); Saini Dep., Aug. 9, 2005 (Ex. I); Saini Dep., Dec. 16, 2005 (Ex. J).) In his expert report and depositions on The Siena's behalf, Saini provided several different categories of evidence, including:

(1) internal IGT communications summarizing malfunction reports from IGT customers and IGT's conclusions about possible causes of the malfunctions (CVT Field Problems: Cross–Functional Quality Meeting—Notes, Apr. 17, 2001 (Ex. F).),

(2) IGT re-work instructions aimed at fixing some of the above-mentioned problems (IGT CVT + Re–Work Instructions, Feb. 3, 2003 (Ex. D attachment B)),

(3) pages from an operating manual for one of the IGT devices in question (IGT

and Acres Gaming System Implementation at Siena (Ex. D attachment D)), (4) an internal IGT memo written by Saini in which he identified problems allegedly created by use of excess adhesive (CVT Field Problems Memo, Dec. 29, 2003 (Ex. E)),

(5) factual testimony from Saini alleging that he had tried to get IGT to fix the problems he had identified above (*See, e.g.,* Saini Dep. 11:9–12, Aug. 9, 2005), and

(6) factual testimony from Saini alleging that IGT placed used parts in IGT products that were sold as new. (*Id.* 81:14–17.)

At least one document disclosed by Saini's expert report, the re-work instructions, was labeled on its face as confidential. (*See* IGT CVT+ Re–Work Instructions, Feb. 3, 2003 (Ex. D attachment B).) Saini distributed the expert report and the above-mentioned documents to other experts hired by IGT, including at least one person who also works for an IGT competitor. (Johnson Dep. 7:9–16, 18:24–19:12, August 9, 2005 (Ex. K); Bandall Dep. 43:16–44:9, Aug. 11, 2005 (Ex. L).)

Following Saini's August 9, 2005, deposition, IGT filed the pending motion for a preliminary injunction, alleging that Saini's testimony and disclosure of documents violate Saini's employee Invention and Secrecy Agreement with IGT. (Mot.8–9.) At the hearing on the motion, IGT also asserted that Saini breached the Incentive Stock Option Agreement. In response, Saini contends that he has not breached the confidentiality agreements because he is disclosing a wrong committed by IGT and that information is not properly the subject of the confidentiality agreements. (Opp'n 4–7.)

## III. Discussion

■ A party seeking a preliminary injunction must meet one of two tests: traditional or alternative. *Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1319 (9th Cir.1994). The traditional test requires the movant to show that:

1. the moving party will suffer irreparable injury if injunctive relief is not granted;

2. the moving party will probably prevail on the merits;

3. in balancing the equities, the non-moving party will not be harmed more than the movant is helped by the injunction; and

4. granting the injunction is in the public interest.

*Id.*

■ In the alternative, a court may issue a preliminary injunction if the movant shows either:

[1.] a combination of probable success on the merits and the possibility of irreparable injury; or

[2.] that serious questions are raised, and the balance of hardships tips sharply in his favor.

*Id.* (formatting altered).

■ Although phrased as such, the alternative test is less an either/or formulation as it is a type of sliding scale. The two prongs represent " 'extremes of a single continuum,' rather than two separate tests." *Sun Microsystems, Inc. v. Microsoft Corp.,* 188 F.3d 1115, 1119 (9th Cir. 1999) (quoting *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers,* 584 F.2d 308, 315 (9th Cir.1978)). That is, the more the balance of hardships tips in favor of the plaintiff, the less probability of success must be demonstrated. *Walczak v. EPL Prolong, Inc.,* 198 F.3d 725, 731 (9th Cir.1999).

■■ Whichever test is applied, a preliminary injunction should only be granted if the movant does not have an adequate

remedy at law. *Stanley*, 13 F.3d at 1320 (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959)). A preliminary injunction is an "extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (quoting 11A Charles Alan Wright & Arthur Miller, *Federal Practice & Procedure* § 2948 (2d ed.1995)). "The cases best suited to preliminary relief are those in which the important facts are undisputed, and the parties simply disagree about what the legal consequences are of those facts." *Remlinger v. State of Nev.*, 896 F.Supp. 1012, 1015 (D.Nev.1995).

## A. Irreparable Injury

Movant IGT alleges that Saini's disclosure of confidential documents and facts irreparably injures its economic and competitive position. IGT argues that Saini's disclosure creates three distinct irreparable injuries: (1) dissemination of trade secrets and confidential information to IGT's competitors, (2) harm to IGT's reputation and customer relationships, and (3) enablement of fraud and theft by people who would use the information to tamper with IGT devices.

■■■ We find that Saini's disclosure of confidential information or trade secrets would create irreparable injury to IGT. Public disclosure of a trade secret destroys the information's status as a trade secret. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1002, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984). This harms the trade secret owner by both depriving him of a property interest, *see id.* at 1002–03, 104 S.Ct. 2862, and by allowing his competitors to reproduce his work without an equivalent investment of time and money. *See Winston Research Corp. v. Minnesota Min. &*

*Mfg. Co.*, 350 F.2d 134, 142 (9th Cir.1965). Disclosure of non-trade secret confidential information is similarly recognized as a serious harm. *Union Pacific R.R. Co. v. Mower*, 219 F.3d 1069, 1071 n. 1 (9th Cir. 2000). These harms, which are not readily addressed through payment of economic damages, are sufficient to meet the irreparable injury requirement for a preliminary injunction.

■■■ We find that the other alleged harms are too speculative to support a finding of irreparable injury. The Ninth Circuit has declined issuing injunctions based on loss of goodwill in cases where the likelihood of damage to customer relationships is unsupported by evidence. *See Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 849–50 (9th Cir.1985); *Goldie's Bookstore, Inc. v.Super. Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984); *cf. Sampson v. Murray*, 415 U.S. 61, 89–91, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) (damage to reputation is not irreparable injury). Since IGT presented no hard evidence of any damage to its existing customer relationships, we find that harm speculative. Similarly, while it may be true that public disclosure of the information contained in Saini's expert report would enable fraud against IGT's customers, this harm is too speculative to support a preliminary injunction. Thus, we do not rely upon either possibility in finding the existence of an irreparable harm to IGT.

## B. Probable Success on the Merits

■■■ In order to justify the "extraordinary remedy" of a preliminary injunction, IGT must also demonstrate its probable success on the merits of their claims. Here, IGT must show that it is likely to succeed in its breach of contract claim against Saini. Nevada law requires the plaintiff in a breach of contract action to show (1) the existence of a valid contract,

(2) a breach by the defendant, and (3) damage as a result of the breach. *Richardson v. Jones,* 1 Nev. 405, 405 (Nev. 1865).

Our analysis of the available evidence shows that IGT has a strong probability of success on its claims for breach of contract against Saini. Having already found that the possibility of irreparable injury exists, there is no need to re-examine the question of whether Saini's breach damages IGT. Instead, we turn to addressing whether there is a valid agreement between the parties and whether Saini has breached that agreement. We answer both questions in the affirmative, which supports IGT's request for a preliminary injunction.

### 1. Existence of a Valid Contract

We find that both the Invention and Secrecy Agreement and the Incentive Stock Option Agreement are valid contracts. Saini presents only one argument against the agreements' validity. Basically, he contends that they are unenforceable as a matter of public policy to the extent that IGT seeks to use them to suppress evidence of illegal actions.

Saini cites three cases in support of his position that the agreements between IGT and Saini are unenforceable: *E.E.O.C. v. Astra U.S.A., Inc.,* 94 F.3d 738, 744 (1st Cir.1996), *Chambers v. Capital Cities /ABC,* 159 F.R.D. 441, 444 (S.D.N.Y.1995), and *In re JDS Uniphase Corp. Securities Litigation ("JDS Uniphase"),* 238 F.Supp.2d 1127, 1137 (N.D.Cal.2002). These cases represent two distinct approaches to addressing whether an agreement is unenforceable as a matter of public policy. *Astra U.S.A.* applied a balancing test weighing the competing interests present in the specific lawsuit to determine whether a settlement agreement could be used to prevent disclosure of violations of federal employ-

ment law. *See id.,* 94 F.3d at 744–45. In contrast, *Chambers* and *JDS Uniphase* applied a rule that confidentiality agreements cannot be used for the purpose of interfering with discovery into alleged wrongdoing. *See Chambers,* 159 F.R.D. at 444 (holding that "it is against public policy for parties to agree not to reveal ... facts relating to alleged or potential violations of [federal] law."); *accord JDS Uniphase,* 238 F.Supp.2d at 1137 (noting agreement with *Chambers* that employers "cannot use their confidentiality agreements to chill former employees from voluntarily participating in legitimate investigations into alleged wrongdoing....").

Although none of these cases is controlling precedent, we have analyzed them closely as persuasive authority—particularly since there does not appear to be any controlling authority on this issue in the Ninth Circuit. Having examined all three cases, we find that none of them support Saini's contention that the agreements asserted by IGT are unenforceable as a matter of public policy. The cases simply do not announce a sweeping rule that renders confidentiality agreements unenforceable such that former employees may initiate contact with private litigants and disclose confidential information or trade secrets.

In *Astra U.S.A.,* the First Circuit upheld a preliminary injunction enjoining an employer "from entering into or enforcing settlement agreements containing provisions that prohibit settling employees both from filing charges of sexual harassment with the [EEOC] and from assisting the [EEOC] in its investigation of any such charges". 94 F.3d at 740–41. Noting that "'[a] promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement,'" the court weighed the employer's interest in dispute resolution against the public inter-

est in enforcing laws against sexual harassment. *Astra U.S.A.*, 94 F.3d at 744–45 (quoting *Town of Newton v. Rumery*, 480 U.S. 386, 107 S.Ct. 1187, 94 L.Ed.2d 405 (1987)). Concluding that abrogating the confidentiality clauses of the settlement agreements would be no disincentive to settling complaints, while enforcing them would seriously hinder the EEOC's enforcement of laws against sexual harassment, the court held that such settlement agreements were unenforceable as a matter of public policy. *Id.*

*Astra U.S.A.* does not support Saini's position because the balancing test used in *Astra U.S.A.* produces a different result in this case. Here, the interests being balanced are the protection of confidential information and trade secrets versus prevention of the sale of malfunctioning gambling equipment. Whereas preventing enforcement of the settlement agreements at issue in *Astra U.S.A.* provided no disincentive to dispute resolution, allowing employees to disregard confidentiality and trade secret agreements does seriously hinder protection of confidentiality and trade secrets. While there is certainly a public interest at stake in uncovering the sale of defective products, we find that public policy is not as high a priority as enforcement of sexual harassment law by the EEOC, at least when, as here, the defect at issue is not a threat to the safety or economic well-being of the public at large. Finally, we note that the settlement agreements at issue in *Astra U.S.A.* were specifically designed to stifle evidence of wrongdoing, whereas the agreements at issue here are standard confidentiality agreements. Thus, we find that the public's interest in uncovering any sale of defective gambling devices is not so great as to outweigh the public interest in enforcement of trade secret and confidentiality agreements.

Further, *Chambers* and *JDS Uniphase* militate against a finding that Saini had a right to disregard his confidentiality agreements with IGT. In *Chambers,* the court held that the plaintiff in an age discrimination case could not instruct the defendant's former employees to disregard their confidentiality agreements with the defendant. 159 F.R.D. at 444–45. The court acknowledged that it was against public policy to agree not to reveal "facts relating to alleged or potential violations of [federal] law," *id.* at 444, and even ruled that the employer's refusal to allow interviews regarding such facts could give rise to an adverse inference against the employer. *Id.* at 445. But the *Chambers* court carefully limited the question before it to depositions and pre-deposition interviews "where the former employee is *not the initiating party.*" *Id.* at 444 (emphasis added). In *JDS Uniphase,* the underlying lawsuit was a securities fraud class action, but the situation was otherwise identical to *Chambers* in that the plaintiff was initiating contact with individuals bound by confidentiality agreements within the context of preliminary investigations in a lawsuit. *JDS Uniphase,* 238 F.Supp.2d at 1130.

Ultimately, the courts in *Chambers* and *JDS Uniphase* refused to give the plaintiffs carte blanche to instruct the defendant's employees to disregard their existing confidentiality obligations on the ground that it "would make plaintiff's counsel the decisionmaker concerning what confidentiality requirements were related to genuine trade secrets or other legitimately privileged information, and which dealt with concealment of information relating to potential improprieties on the part of the employer." *Chambers,* 159 F.R.D. at 445; *accord JDS Uniphase,* 238 F.Supp.2d at 1137–38. Instead, both courts held that the plaintiffs could interview the defendants' employees regarding evidence of wrongdoing, but only under conditions controlled by the court. *See Chambers,* 159 F.R.D. at 445–46 (holding

that plaintiff could only interview former employees bound by confidentiality agreements if plaintiff gave defendant notice and opportunity to attend interviews); *JDS Uniphase*, 238 F.Supp.2d at 1138 (holding that plaintiff's questions to former employees bound by confidentiality agreement must be limited to those submitted to and approved by the court).

Thus, while the cases cited by Saini do identify limits to the ability to suppress evidence through use of confidentiality agreements, they do not indicate a broad rule invalidating confidentiality agreements. *Chambers* and *JDS Uniphase* merely stand for the unremarkable proposition that confidentiality agreements will not stand as a barrier to discovery between two parties in litigation. *See also,* NRS 49.325 (abrogating trade secret privilege in those cases where invoking the privilege would "conceal fraud or otherwise work injustice"). This rule is not pertinent here because we are not presented with the question of whether to allow The Siena to perform interviews or depositions of former IGT employees. The only question before us is whether it is within the prerogative of IGT's former employees to disregard their confidentiality obligations toward IGT and disclose whatever evidence those employees believe to be evidence of wrongdoing to third parties.

Applying the logic of *Chambers* and *JDS Uniphase* to the present case, we find that confidentiality agreements between employers and employees do not become unenforceable just because the employee decides that the employer has committed a wrongful or illegal act. In essence, the case at bar is the flipside of the situation presented by *Chambers* and *JDS Uniphase*. Whereas the employees in those cases were contacted on someone else's initiative, here it is the employee, Saini, who has initiated contact with The Siena. Saini, like the plaintiffs in *Chambers* and

*JDS Uniphase*, seeks to establish a prerogative to act as decisionmaker about what information IGT does and does not have a legitimate confidentiality interest in. But Saini has no more right to unilaterally decide what IGT information is legitimately confidential than the plaintiffs in *Chambers* and *JDS Uniphase* did. In short, this decision is not within Saini's prerogative, and Saini cannot simply assert that the agreements were ineffective because he believes that IGT engaged in an illegal act.

We also find that Saini does not deserve any immunity or protection as a whistleblower. This argument is essentially a variant of Saini's unenforceability argument, and it is no more convincing than that argument. It is certainly true that there are situations where Congress or a state legislature provide special protections to employees who come forward of their own initiative to report illegal actions by their employers. *See, e.g., JDS Uniphase*, 238 F.Supp.2d at 1136 (noting that Congress "has indicated a public policy in favor of whistleblowers in securities cases"); *Int'l Game Tech., Inc. v. Second Judicial District Court of the State of Nevada*, 127 P.3d 1088, 1107 (Nev.2006) (noting whistleblower protections under Nevada False Claims Act). However, we are not aware of any breach of contract cases where a court has provided whistleblower protection to a witness, and Saini does not cite any. We therefore conclude that a private breach of contract dispute between IGT and The Siena does not represent an illegal activity that invokes special whistleblower protection.

Even if a private breach of contract dispute did warrant special whistleblower protections, they would not be appropriate in Saini's case because his actions were proprietary in nature. The Supreme Court of Arizona persuasively laid out the

distinction between public oriented whistleblowing activity and private or proprietary acts:

> So long as employees' actions are not merely private or proprietary, but instead seek to further the public good, the decision to expose illegal or unsafe practices should be encouraged. We recognize that there is a tension between the obvious societal benefits in having employees with access to information expose activities which may be illegal or which may jeopardize health and safety, and accepted concepts of employee loyalty; nevertheless we conclude that on balance actions which enhance the enforcement of our laws or expose unsafe conditions, or otherwise serve some singularly public purpose, will inure to the benefit of the public.

*Wagner v. City of Globe,* 150 Ariz. 82, 722 P.2d 250, 257 (1986) (internal citation omitted). Here, Saini admitted in a deposition that he only testified "to be paid" and "for no other reason." (Saini Dep. (Ex. J) 6:11–19.) Whether or not Saini was also motivated by a desire to retaliate against IGT for his dismissal-as alleged by IGT-his admission that his primary motive was pecuniary gain is sufficient to take his actions out of the realm of public purpose and into that of the "private and proprietary." *See Wagner,* 722 P.2d at 257. Under these circumstances, Saini does not warrant classification as a whistleblower.

In summary, we find that IGT's confidentiality agreements with Saini are valid and enforceable. In making this finding, we identify three different situations where such agreements might not be enforceable:

(1) if the interest in the agreement's enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement,

(2) if the agreement is being used by one party within the context of litiga-

tion to suppress an adverse party's access to evidence, and

(3) if the employee is disclosing an illegal or wrongful act for a purely public purpose, such as whistleblowing.

None of these bases for limiting or prohibiting enforcement of a contract are present here, where Saini is acting out of private and proprietary motives.

**2. Existence of a Breach**

 IGT has presented evidence showing a high likelihood that Saini has breached both the literal terms of his agreements with IGT and the implied covenant of good faith and fair dealing attached to those agreements. Failure to perform one's obligations within the express terms of an agreement constitutes a literal breach of contract. *See Nelson v. Planet Ins. Co.,* 111 Nev. 1373, 906 P.2d 703, 705–07 (1995). Here, the express terms of IGT's Invention & Secrecy Agreement and its Incentive Stock Option Agreement call for Saini to hold all confidential IGT information and trade secrets in confidence, not to deliver IGT documents and memoranda to other parties, not to publish information learned at IGT in confidence, and not to use information learned at IGT against IGT. Saini has facially violated every one of these obligations by delivering confidential IGT documents to The Siena and its expert witnesses for use in its litigation against IGT.

 The only defense that Saini offers is that the information in question is neither "confidential commercial information" nor trade secrets, and therefore not legitimately within the purview of the agreements. Under Nevada law, a trade secret is defined as:

> information, including, without limitation, a formula, pattern, compilation, program, device, method, technique, product, system, process, design, proto-

type, procedure, computer programming instruction or code that:

(a) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by the public or any other persons who can obtain commercial or economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

NRS 600A.030. There is no definition of "confidential" information under Nevada law, but Black's Law Dictionary defines "confidential as [i]ntrusted with the confidence of another or with his secret affairs or purposes; intended to be held in confidence or kept secret; done in confidence." *Id.* 297 (6th Ed.1990).

While some of the information disclosed by Saini may not be confidential, much of it qualifies both as confidential and as trade secrets, which is sufficient to support a finding that he likely breached the agreement. For instance, the mere existence of customer complaints cannot be confidential, because they are known by third parties—the customers reporting the complaints. But the re-work instructions Saini disseminated contain detailed engineering schematics and specifications and were explicitly labeled "confidential." (IGT CVT+ Re–Work Instructions, Feb. 3.2003 (Ex. D attachment B).) Similarly, the notes from the cross-functional quality team meeting contain not only references to reported problems, but the opinions and conclusions of IGT employees regarding the technical sources of those problems. (CVT Field Problems: Cross–Functional Quality Meeting—Notes, Apr. 17, 2001 (Ex. F).) This information, which goes to the heart of how IGT's devices function, is economically valuable information. IGT presented testimony from its vice-presi-

dent of research and development indicating that this material was confidential and subject to reasonable efforts to protect its confidentiality, while Saini provided no evidence indicating that it was not. Accordingly, we find that IGT has carried its burden of proving that the information is economically valuable and not generally known to the public, which fulfills the definitions of both a trade secret and confidential information.

▮▮▮ IGT has also demonstrated a probability of successfully proving a breach of the implied covenant of good faith and fair dealing attached to those agreements. "Where the terms of a contract are literally complied with but one party to the contract deliberately countervenes [sic] the intention and spirit of the contract," that contravention may be a breach of the implied covenant of good faith and fair dealing. *Hilton Hotels Corp. v. Butch Lewis Productions, Inc.,* 107 Nev. 226, 808 P.2d 919, 922–23 (1991). IGT has legitimate interests in its trade secrets and the confidentiality of its employer-employee relationships. *See Winston Research Corp. v. Minnesota Min. & Mfg. Co.,* 350 F.2d 134, 138 (9th Cir.1965). Saini's decision to distribute internal IGT documents to a party adverse to IGT in litigation demonstrates a deliberate intent to violate the spirit of his confidentiality agreements with IGT, regardless of whether the documents reflected confidential information or trade secrets. Thus, we find that IGT has also demonstrated a likelihood of success in proving a breach of the implied covenant of good faith and fair dealing.

**C. Balance of Harm**

▮▮▮ The balance of harm in this case heavily favors IGT. IGT faces the disclosure of trade secrets and confidential information about its internal operations. In contrast, Saini presents no evidence of

hardship in his briefs, and the only potential hardship that the court can identify is the loss of witness fees associated with his testimony on behalf of The Siena, which is not compelling. Because the balance of harms greatly favors IGT, it need only show that it has raised a significant legal question in order to merit a preliminary injunction under the alternative test. *See Walczak v. EPL Prolong, Inc.*, 198 F.3d 725, 731 (9th Cir.1999).

**D. Public Interest**

 The court finds that it is in the public interest to issue the injunction requested by IGT under the circumstances present here. "The public interest inquiry primarily addresses [the] impact on nonparties rather than parties." *Sammartano v. First Judicial District Court*, 303 F.3d 959, 974 (9th Cir.2002). "Generally, public interest concerns are implicated when a constitutional right has been violated, because all citizens have a stake in upholding the Constitution." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005). Although there are no constitutional rights at issue in this dispute, Saini's argument that granting a preliminary injunction would "significantly hinder prosecuting business misconduct" (Opp'n 5) raises a potential public interest issue. For its part, IGT argues that any public interest in prosecuting wrongdoing is counterbalanced by an equivalent public interest in enforcing contracts. (Mot.9.)

Any public interest analysis performed here would be redundant with the public policy analysis performed to determine if IGT's agreements were unenforceable as against public policy, *supra*. Since that analysis led to the conclusion that individuals are not free to ignore confidentiality agreements, it follows that there is a public interest in enforcing confidentiality agreements. At the very least, there is no public interest against enforcing the agreement where an individual has taken it upon himself to disclose confidential information solely for pecuniary gain. Accordingly, the court finds that the public interest favors issuing an injunction on IGT's behalf.

**III. Conclusion**

We hold that IGT is entitled to a preliminary injunction against Saini prohibiting his disclosure of confidential information to third parties and ordering him to return confidential and proprietary documents that he removed or received from IGT. IGT has shown that it would suffer irreparable harm from Saini's disclosure of this material, that it is likely to succeed on the merits, that the balance of harms weighs decidedly in its favor, and that granting the injunction is within the public interest.

*IT IS HEREBY ORDERED* that Defendant and Counterclaimant's Motion for Preliminary Injunction (# 16) is *GRANTED*. A separate preliminary injunction shall issue.